(PRIZE.)

## The ANNA MARIA.

A suit by the owners of captured property, lost through the fault and negligence of the captors, for compensation in damages.

The right of visitation and search is a belligerent right which cannot be drawn into question; but must be conducted with as much regard to the safety of the vessel detained, as is consistent with a thorough examination of her character and voyage.

Detention, after search, pronounced to be unjustifiable, under the circumstances of the case.

The value of the captured vessel, and the prime cost of the cargo, with all charges, and the premium of insurance, where it has been paid, allowed in ascertaining the damages.

APPEAL from the circuit court for the district of Maryland.

March 11th.    This cause was argued by Mr. *Harper* and Mr. *Swann*, for the appellants; and by Mr. *Winder* and Mr. *Jones*, for the respondents.

THE schooner Anna Maria, belonging to citizens of the United States, sailed from Alexandria, on the 27th of September, 1812, laden with a cargo also belonging to American citizens, and bound to St. Bartholomews, a neutral island. On the 16th of October, the schooner made the Virgin islands, where she continued, it being calm, until the 19th. About mid-day, on the 19th, light breezes sprung up from the eastward, and the Anna Maria, as stated by her master, was using her utmost endeavours to make St. Bartholomews. It appears, however, that the vessel headed towards St. Thomas's, an island in possession of the British. In this situation a sail, which proved to be the Nonsuch privateer, of Baltimore, was discovered bearing east northeast from them, which gave chase under English colours, and soon overtook them. The Anna Maria was boarded about four in the afternoon, and her master, with all her papers, sent on board the Nonsuch. A search for other papers was commenced and continued for

about two hours. The boarding officer, who had
appeared in the disguise of a British officer, then
returned to the Nonsuch, being succeeded by another
officer, who kept possession of the Anna Maria with
two men, and was ordered to continue under the lee
of the Nonsuch till the succeeding day, when it was
intended, as alleged, to continue the search. The
whole crew of the Anna Maria were taken out, and,
with her master, put in irons. The next morning,
about nine, two other vessels were descried, and,
as stated by the master of the Anna Maria, and by
one of the officers of the privateer, were chased by
the Nonsuch. In the chase she lost sight of the
Anna Maria, and soon afterwards fell in with her.
The officer, with the two men on board her, at-
tempted, as they say, to bring her into the United
States; but, being in want of water, wood, and can-
dles, they went into St. Jago del Cuba, and sold
a part of the cargo to enable them to purchase these
necessaries. In attempting to bring the vessel out
of port, she was run aground and injured; after
which she was sold with the residue of her cargo,
and the proceeds remained in the hands of the
American consul for those who may be entitled to
them.

The Nonsuch soon afterwards returned to the
United States, and a libel was filed by the owners
of the Anna Maria and cargo, against the owners of
the Nonsuch, in the district court of Maryland, claim-
ing compensation in damages for the injury they had
sustained. This libel was dismissed by the district

court, and the decree affirmed by the circuit court on which the cause was brought, by appeal, to this court.

March 11th. · Mr. *Swann* and Mr. *Harper,* for the appellants, admitted, that the owners of the captured property could not come into a court of prize, unless with clean hands, to claim restitution in damages. If the original seizure was justifiable, and there was no subsequent misconduct on the part of the captors, they could not be compelled to make restitution. But it is the duty of captors to send in the captured vessel immediately for adjudication before the proper tribunal, and to the most convenient port. This they had not done; and were, therefore, responsible to the owners in damages. Even if the commander of the privateeer acted *bona fide,* he acted with gross negligence and unskilfulness, and the authority of the case of the Der Mohr[a] is enough to charge him with restitution in value.

Mr. *Winder* and Mr. *Jones,* for the respondents, argued, upon the facts of the case, that the real destination of the captured vessel was to supply the enemy, and that there was probable cause of seizure. If so, damages could not be recovered. There was sufficient ground for carrying in for adjudication, or ground of condemnation as prize; either would be sufficient to justify the captors in the seizure; the only question is, whether the right of seizure was

a 3 *Rob.* 129.   4 *Rob.* 314.

properly exercised. The prize law does not prescribe <span></span>1817.
any particular mode of exercising the right of visi-
tation and search, nor when, nor into what particular <span></span>The
port the prize is to be sent for adjudication. It is <span></span>Anna Maria.
the exercise of a military discretion; and the case
of the Der Mohr shows that the captors are not
responsible for an *accidental* loss after the capture,
if there is probable cause of seizure and carrying in
for adjudication.

Mr. Chief Justice MARSHALL delivered the opinion <span></span>March 13th.
of the court, and after stating the facts proceeded
as follows:

To sustain the claim of the libellants, the first
point to be established is, the fairness of the voyage.
It being admitted that the vessel and cargo were
American, the only inquiry is, was the Anna Maria
really destined for a neutral port?

Her papers show that she was destined for St.
Bartholomews; her master swears that he intended
to reach that port, and no other; and that he was
using his best endeavours to make it when he was
stopped by the Nonsuch.

The circumstances which might create doubt re-
specting the truth of this testimony, are, his situation
and course when descried by the Nonsuch. He
was within six or eight leagues of St. Thomas's, and
steering a course which brought him nearer to that
island. But his place is accounted for by the cur-
rent and the calm which had preceded his capture;
and his course is stated by himself, and his testi-

mony is not contradicted, to have been calculated to enable him to gain St. Bartholomew's, to the leeward of which he had fallen. This representation is supported by the fact, that being at the Virgin Islands on the 16th, he might, by availing himself of the current, have reached St. Thomas's before he was descried by the Nonsuch. It is also supported by the great improbability of his attempting to enter an enemy's port without obtaining a license, which would have protected him from hostile capture in that port, as well as on his voyage to it. That he had not a license is proved, not only by his own oath, but by the fact that, although the master and crew, as well as the vessel, have remained in possession of the captors, no license has been found, and there is no reason to believe that it could have been secreted, and it is not probable that it would have been destroyed on the appearance of the Nonsuch, since she chased and boarded under British colours.

The voyage, then, must be considered as entirely fair. The next subject of inquiry is, the right to visit and to detain for search. This is a belligerant right, which cannot be drawn into question. As little can it be questioned that the situation of the Anna Maria justified a full and rigorous search. But this search ought to have been conducted with as much regard to the rights and safety of the vessel detained as was consistent with a thorough examination of her character and voyage. All that was necessary to this object was lawful; all that transcended it was unlawful.

When the Anna Maria was boarded, her master gave a plain and true account of the character of the vessel and cargo, which was verified by the ship's papers, and which does not appear to have been doubted. But although the vessel and cargo were American, the trade might be hostile; and the right to examine fully into this fact was complete.

There was no prevarication in the statements of the master which could excite suspicion, and the search for other papers was continued for two hours without intermission. Although the character of British officers was maintained, nothing indicating British connection in the voyage was discovered; and, although the trunks were broken open and searched, no additional papers were found. It was pressing the right of search as far as it could bear, to determine on repeating it the next day; and an inattention to the safety of the Anna Maria, which only her neighbourhood to the island of St. Thomas could excuse, longer to detain her. But there is some reason to doubt whether further search was the real object of this detention. It does not appear to have been recommenced at nine the next morning; and this leads to the opinion that the vessel was detained, not so much to make farther search as in the hope of drawing from the master, or some of the crew, who were all in irons, something which might lead to the condemnation of the vessel and cargo. This conduct must be viewed with much lenity to be pardoned. But whatever excuse may be made for the detention thus far, none can be given for the transactions which remain to be noticed.

Before the captain of the Nonsuch left the Anna Maria, in pursuit of other objects, he ought to have decided either to seize her as prize or to restore her. Had he seized her as prize, her master, at least, ought to have been returned to her, and her papers should have been sealed and put in possession of a prize master. If he determined not to seize her as prize, her master and crew ought to have been restored, that she might have prosecuted her voyage. No apology can be made for leaving her in the condition in which she was placed. Stripped of her crew and of her papers, left in possession of an officer and two men, without orders whither to proceed, she was exposed to dangers; for the loss resulting from which, those who placed her in this situation must be responsible. Had she been regularly captured, many of the difficulties encountered in St. Jago del Cuba might have been avoided; had she been restored, she might, and probably would, have reached her port of destination in safety.

The proceedings of the Nonsuch, after a search, converted the whole transaction into a wanton marine trespass, for which no sufficient excuse has been given.

However meritorious may have been the services of the private armed vessels of the United States, in the aggregate, those individuals who have acted with this culpable disregard to the rights of others ought not to escape the animadversion of the law. The conduct of the officers of the Nonsuch on board the Anna Maria was unjustifiably licentious. Break-

ing open trunks when keys were offered them, taking out the crew and putting them in irons, and leaving her in this situation, were acts not to be excused. The honor and the character of the nation are concerned in repressing such irregularties; and the justice of the court requires that compensation should be made for the injury which the libellants have sustained.

The sentence of the circuit court must be reversed, and the cause remanded to the circuit, with directions to reverse the sentence of the district court, and to direct commissioners to ascertain the amount of damages sustained by the libellants; in doing which, the value of the vessel, and the prime cost of the cargo, with all charges, and the premium of insurance, where it has been paid, with interest, are to be allowed. Out of this decree must be deducted the amount of the proceeds of the Anna Maria and cargo, unless the libellants shall choose to abandon those proceeds to the defendants.

Sentence reversed.<sup></sup>

*b* Vide APPENDIX, Note I.