**ASPHALT INTERNATIONAL, INC., Appellant,**

v.

**ENTERPRISE SHIPPING CORPORATION, S.A., Appellee.**

**No. 426, Docket 81-7502.**

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1981.

Decided Dec. 10, 1981.

Arthur M. Boal, Jr., Boal, Doti & Larsen, New York City, for appellant.

Thomas L. Rohrer, Healy & Baillie, New York City, for appellee.

Before KAUFMAN, TIMBERS and MESKILL, Circuit Judges.

KAUFMAN, Circuit Judge:

Since the days of the ancient Phoenician traders, maritime contracts have been drafted and challenged. Even today, the vicissitudes of the seas cause mishaps which prevent full performance of contracts. The instant case involves a relatively common occurrence with novel commercial implications. We must determine whether the owner of a vessel rammed amidships while on charter may treat the vessel as a total loss and be excused from further liability pursuant to the terms of the charter party agreement, where the cost of repair exceeds the vessel's pre-collision fair market value but is less than the insurance proceeds received by the owner.

Asphalt International had chartered the T-2 tanker Oswego Tarmac from its owner, Enterprise Shipping Corporation. While loading asphalt cargo alongside a pier in Curacao, the vessel was rammed amidships by the bow of the motor vessel Elektra and sustained extensive damage. Convinced that the cost of repair was prohibitive because the ship had been declared a total loss, Enterprise ultimately sold the vessel for scrap. Asphalt, however, disagreed with this determination and subsequently instituted an action for breach of contract for failure to repair the Oswego Tarmac.

In accordance with the terms of the charter party agreement, and by operation of law pursuant to the doctrine of commercial impracticability, the district court found that Enterprise was excused from its obligation to repair the ship. Accordingly, Judge Sand dismissed the causes of action for breach of contract. We affirm the district court's judgment.

## I.

A brief review of the facts will suffice to frame the legal issues raised on this appeal. In 1976, Enterprise Shipping Corporation leased the tanker Oswego Tarmac to Asphalt International, Inc. pursuant to a time charter agreement that obligated Enterprise to repair and insure the vessel. Enterprise was also required to "make and maintain the vessel ... in good order and condition, in every way fit for the service and in every way fit to carry the cargoes provided for ...." Enterprise was, however, absolved from responsibility for "any loss or damage arising or resulting from ... collision," unless otherwise provided by the charter agreement. Furthermore, the contract stated that "[s]hould the vessel be lost, hire shall cease at noon on the day of her loss...."

Late in the evening of July 29, 1977, the Oswego Tarmac lay fast alongside the jetty in Curacao loading asphalt cargo. Moments later, the tanker listed helplessly, having been struck four times by the motor vessel Elektra with such heavy impact that four of its tanks ruptured, and heated asphalt spewed across the harbor.[1] Soon thereafter, the owners of both ships commissioned expert appraisers to assess the extent of the damage suffered by the tanker. The appraisers submitted a joint field survey in which they estimated the cost of repair at not less than $1,500,000. Armed with this information, Enterprise advised Asphalt that it considered the Oswego Tarmac a complete loss, since its fair market value prior to collision was approximately $750,-

---

1. No party has claimed that the Oswego Tarmac, its owner, master or crew were in any way at fault for the damage. We do not decide what result we would reach if fault were alleged.

000. Disagreeing with the damage estimates reported in the joint survey,[2] Asphalt requested that Enterprise repair the Oswego Tarmac; Enterprise refused. At the recommendation of Enterprise's appraiser who stated that repair would be infeasible, Enterprise sold the ship as scrap for $157,500. The company then collected insurance proceeds of $1,335,000 on its $2,500,000 marine hull insurance policy, an amount which exceeded the ship's fair market value.[3]

Asphalt then instituted this action in the Southern District of New York. It alleged that Enterprise had breached its duty to repair the vessel under the charter party agreement and sought damages in the amount of $1,278,831 for lost business and profits expected in the course of full performance of the charter. The charterer claimed that the agreement expressly placed responsibility for maintenance and repair on Enterprise, which had breached the agreement by failing to undertake such repair or to provide substitute service. At trial, Asphalt offered its own damage estimate indicating that repair would cost considerably less than the vessel's pre-collision fair market value. It, however, offered no conflicting estimate of the tanker's fair market value.

Noting that the vessel was forty-four years old at the time of the collision and in need of improvements to pass an impending inspection, Judge Sand properly calculated that the cost of restoring the vessel would indeed have exceeded its fair market value

prior to the collision. Furthermore, the trial judge concluded that the facts as they appeared to Enterprise at the time shortly after the collision, when it had to decide whether to repair or abandon the ship, would be the more appropriate basis for determining whether Enterprise's actions were reasonable. After undertaking a close examination of the facts, Judge Sand reasoned that for the purpose of determining the shipowner's obligation to repair, the vessel should be considered a "constructive total loss." Accordingly, the owner of the wrecked vessel could offer it to its insurer in exchange for immediate payment of the insurance proceeds. Judge Sand concluded in a well-reasoned opinion that because the vessel was a "constructive total loss," the owner's obligation to repair was excused by the express provisions of the charter party agreement. Moreover, the judge held that Enterprise was relieved of its duty to repair under the doctrine of commercial impracticability. Accordingly, he dismissed Asphalt International's complaint. This appeal followed.

## II.

Turning to the legal issues, we conclude that the lower court properly dismissed Asphalt International's complaint. Because of the novel questions presented, we add our views to Judge Sand's opinion. We agree with his holding that it would have been commercially impracticable for Enterprise to repair the damaged vessel.

2. The appellant, Asphalt International, Inc., sought to impugn the results of the joint field survey as well as Enterprise's August 1977 decision to abandon the ship by means of two subsequent surveys conducted in September and December of 1977, yielding repair estimates not in excess of the fair market value of the ship. The trial court properly found convincing and controlling the facts as they reasonably appeared to the owner at a time immediately after the collision, when the decision on repair or abandonment was to be made. *See generally* G. Gilmore and C. Black, The Law of Admiralty 84–85 & n.127 (2d ed. 1975).

3. The $2,500,000 figure was chosen by the owner to reflect his investment in the vessel, which included the 1971 purchase price of $475,000 and modifications of its asphalt-carrying sys-

tem amounting to approximately $2,000,000. Unlike land-based forms of insurance in which coverage is limited to the fair market value of that which is insured, Enterprise's marine hull insurance was not so restricted. Judge Sand correctly noted that this insurance policy was essentially a gamble and declined to comment on the "soundness of so overinsuring a vessel." Furthermore, it is well-settled that a shipowner's insurance does not extend his liability in a limitation of liability proceeding. "The proceeds of hull insurance ... do not go into the limitation fund but inure to the owner's benefit." G. Gilmore and C. Black, The Law of Admiralty 752 (footnote omitted), citing *The City of Norwich*, 118 U.S. 468, 30 L.Ed. 134 (1886).

As Judge Sand carefully reasoned, business sense and logic mandated that the owner's duty to repair its vessel was discharged when the vessel was deemed a "constructive total loss."

### A.

■ The doctrine of "constructive total loss" has its conceptual roots in marine insurance law. The applicable principle is that when a shipowner is the insured, and the cost of repairs of his damaged vessel would exceed the repaired value of the ship, the owner may "abandon" the vessel to the insurer as if it were a total loss. The insurer preserves the right to recoup what it can by a sale or other disposition of the vessel. *See Lenfest v. Coldwell*, 525 F.2d 717 (2d Cir. 1975). In essence, the allocation of risk of physical damage to the ship between the insurance underwriter of the wrecked vessel and the shipowner lies at the heart of this doctrine. See *Calmar S.S. Corp. v. Scott*, 209 F.2d 852, 854 (2d Cir. 1954). Here we are asked to decide whether, by the express language of their charter contract, the shipowner and a third party—the charterer—had allocated an entirely different risk—the charterer's risk of loss of business and profits if the vessel was rendered unfit for service. We find no such provision in the charter party agreement. *Cf. McDonough Marine Service, Inc. v. M/V Royal Street*, 465 F.Supp. 928, 935 (E.D. La.), *aff'd*, 608 F.2d 203 (5th Cir. 1979) (agreement provided for occurrences of "total or constructive total loss").

■ Judge Sand also observed the agreement contained no provisions defining the circumstances in which the owner had a duty to repair rather than the right to abandon the ship as "totally lost." Thus, we must look beyond the language of the agreement for any assistance in determining which party should bear the loss caused by the collision.

It appears quite clearly that in maritime cases, when the parties fail to allocate a risk by terms of the contract, courts look to certain time-honored doctrines to determine who shall bear the loss. One applicable principle, the so-called doctrine of impossibility of performance, focuses on whether the event producing the loss was unforeseen, as a means of assessing which party assumed the risk. *Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 318–19 (D.C.Cir.1966); *American Trading and Production Corp. v. Shell International Marine Ltd.*, 453 F.2d 939, 941–42 (2d Cir. 1972). The charter agreement in the instant case did allocate risks of damage in certain circumstances. For example, Enterprise was responsible for routine maintenance of the ship including minor damage repairs. Furthermore, the parties must have contemplated some form of risk allocation in the event of a collision because the agreement provided for termination of the charter should the ship be "lost." Accordingly, the facts in this case lead to the reasonable conclusion that the parties could have foreseen the particular risk at issue—that Asphalt would lose business and profits as a result of damage to the vessel. *See generally* J. White & R. Summers, *The Uniform Commercial Code* 130 (2d ed. 1980).

■ Custom or trade in the industry also provides a basis for allocating risk of loss in appropriate cases. *Transatlantic Financing Corp. v. United States, supra*, 363 F.2d at 315. Judge Sand correctly found that the risk of loss was not allocated by custom in this case. *Asphalt International, Inc. v. Enterprise Shipping Corp.*, 514 F.Supp. 1111, 1116 (S.D.N.Y.1981). *See also* U.C.C. § 1–205; *Restatement (Second) of Contracts* § 220 (1981). The parties chose to introduce no evidence of custom in the shipping industry. Moreover, the issue was not raised on appeal. Therefore we are unable, as was the trial court, to divine the intent of the parties from evidence of custom or trade, if indeed a discernible trade practice had evolved.

### B.

■ Since these traditional avenues of contract interpretation lead us to a cul-de-sac, we turn to general principles of commercial law to illuminate the intent of the parties. A basic tenet of commercial law,

now embodied in the Uniform Commercial Code for cases involving the sale of goods, is that a party's duty to perform pursuant to a contract may be excused on the grounds of commercial impracticability.[4] Specifically, we must determine whether the collision of the vessels Elektra and Oswego Tarmac rendered performance of a putative duty to repair possible only at excessive and unreasonable cost or whether the collision altered the essential nature of the charter party agreement. *See American Trading and Production Corp., supra,* 453 F.2d at 942; *Restatement (Second) of Contracts* § 261 (1981).

█ We are of the view also that the trial court's finding of fact that the Oswego Tarmac could only be repaired at "excessive and unreasonable cost" is not clearly erroneous. *See Restatement (Second) of Contracts, supra,* at § 261. We agree with the court's finding that the repair cost of $1,500,000 far exceeded the $750,000 pre-collision fair market value of the tanker. Surely, imposing the repair obligation on Enterprise sought by Asphalt would require a type of performance essentially different from that for which Asphalt contracted. *See Transatlantic Financing Corp. v. United States, supra,* 363 F.2d at 319 n.15. Indeed, Asphalt's repair request, which would, in effect, require Enterprise to rebuild its virtually demolished vessel, would alter the essential nature of the contract. The con-

tract merely provided for leasing of the vessel to transport asphalt.

█ Finally, we cannot agree with the argument advanced by Asphalt that Enterprise may not enjoy the defense of impracticability because it suffered no financial hardship, but rather received a windfall profit of $961,000 by virtue of the insurance proceeds it collected. The doctrine of commercial impracticability focuses on the reasonableness of the expenditure at issue, not upon the ability of a party to pay the commercially unreasonable expense. *See Transatlantic Financing Corp. v. United States, supra,* 363 F.2d at 319 n.13; *Pauley Petroleum Inc. v. United States,* 591 F.2d 1308, 1319–20 (Ct.Cl.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979).[5] The existence of insurance coverage in excess of the fair market value of the ship bears no relationship to the controlling issue—the reasonableness of the requested repairs. Insurance coverage is like any other asset—it enhances a party's ability to bear a loss, but is not material to the question whether a party has a duty to bear the loss. For the answer to this question, as we have noted, we look to the express terms of the contract and to general principles of contract interpretation. Our conclusion that the receipt of substantial insurance proceeds by the owner does not preclude a defense of commercial impracticability is bolstered by the fact that the charter party

4. *See Transatlantic Financing Corp. v. United States,* 363 F.2d 312 (D.C.Cir.1966). *See also* U.C.C. § 2–615 which provides, in pertinent part:
   Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
   (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

5. We agree with the principle that the "wherewithal" of the shipowner is not a basis upon which to impose liability. The fundamental question involves the appropriate allocation of risk, that should be determined according to which party was in the better position to insure against the various losses occasioned by the collision. The shipowner insured his own property against collision damage and provided the market value and damage appraisals, as he should have. Now the charterer seeks to impose his own uninsured business losses on the shipowner, and to draw on the proceeds from Enterprise's marine hull insurance. Absent clear charter party language to the contrary, we find this proposal to be untenable. *Cf. Lenfest v. Coldwell,* 525 F.2d 717, 720 (2d Cir. 1975) (charterer had purchased an insurance policy covering "Anticipated Profits" in the event of total or constructive total loss of the chartered vessel).

agreement is silent on the amount of insurance to be carried. Indeed, the charter party agreement obligates Enterprise to keep total operating costs, including insurance, to a minimum.

Accordingly, we affirm the judgment of the district court.