Antonio DiMILLO, Plaintiff, Appellee,

v.

SHEEPSCOT PILOTS, INC., Defendant, Appellant.

No. 88–1418.

United States Court of Appeals, First Circuit.

Heard Feb. 8, 1989.

Decided March 15, 1989.

Thomas E. Clinton with whom Robert E. Collins and Clinton & Muzyka, P.C., Boston, Mass., were on brief, for defendant, appellant.

Harold J. Friedman with whom John G. Connor and Friedman & Babcock, Portland, Me., were on brief, for plaintiff, appellee.

Before BREYER, ALDRICH and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Like Aeschylus' much-persecuted hero, defendant-appellant Sheepscot Pilots, Inc. (SPI) bemoans the tempest and proclaims itself wronged. But as Zeus rejected the appeals of the chained Prometheus, we must deny SPI relief save only in a single small respect.

## I

By consent, this case was tried to a magistrate, sitting without a jury. *See* 28 U.S.C. § 636(c). The findings of fact contained in the ensuing rescript, *DiMillo v. SPI*, No. 86–0241P (D.Me. Dec. 1, 1987), aptly eluci-date the contours of the litigation. We summarize them succinctly.

Plaintiff-appellee Antonio DiMillo was an entrepreneur with a nautical bent. He ran a thriving seafood restaurant from a converted ferry anchored in Portland harbor. He wanted to operate a floating hotel as well, and hit upon the idea of converting a barge to that end. Suitable candidates were in short supply. Eventually, DiMillo found the barge of his dreams (the Greenwood), but there was a hitch: she was in Detroit.

As the record verifies, DiMillo was nothing if not resourceful. At substantial cost, he arranged a split tow: a midwestern firm would tow the barge from Detroit to Montreal; SPI would then tow it from Montreal to Portland. The first part of the odyssey went like clockwork. The Greenwood arrived in Montreal shipshape. Defendant's captain, David Winslow, met the barge with a tug and a crew of five on October 12, 1985. They inspected the Greenwood and found everything to be in order. The second phase of the operation then began. The tug and its charge proceeded without untoward incident down the St. Lawrence River, through the gulf, and into the strait separating Nova Scotia from Cape Breton Island. Early in the morning of October 15, a Tuesday, the party arrived in Port Hawkesbury.

At this point, the evidence diverges. The magistrate found, supportably, that the official weather advisory broadcast that morning was as follows:

> Winds light increasing to southeast 15 knots late this morning and to southeast 15 to 25 this evening. Winds veering to southwesterly 20 to 30 Wednesday morning and to westerly 15 to 25 Wednesday afternoon.

Mag Op. at 6. Notwithstanding his own admission that he would not have proceeded if the forecast was for winds from the south, southeast, or southwest up to 25 knots, and his first mate's expression of concern, Winslow ordered the flotilla to leave port shortly after 10 a.m. on October 15.

The weather proved consistent with the forecast. As it worsened, the captain stubbornly continued. Seas reached 17 to 20 feet, with winds in excess of 30 knots. The barge took a brutal pounding in the heavy seas. At about 2 a.m. on October 16, the captain belatedly bowed to the inevitability of nature and headed back to Port Hawkesbury, arriving there at 10:30 a.m.

The rest is history, mostly undisputed. The voyage was resumed in calmer seas late on the afternoon of October 17. Two days later, off Cape Sable, the frontmost rake section collapsed, leaving a gaping hole in the barge's bow.[1] By jury-rigging, the tug was able to complete the tow. The Greenwood arrived in Portland on October 20, stern first and badly damaged.

DiMillo was not pleased. He eventually sued SPI in federal district court. After trial, the magistrate determined the tug's master to have been negligent in taking the barge into rough weather and abysmal sea conditions on October 15, and persisting in the folly. He went on to find the negligence to have caused the structural damage that led to the rake's disintegration. The magistrate awarded damages "limited to the cost of repairing the barge" in the sum of $175,000, plus prejudgment interest. SPI moved unsuccessfully for reconsideration of the verdict, and now appeals.

## II

In a mode reminiscent of Prometheus' squirming as eagles circled above, appellant leaves no stone unturned in attempting to wriggle out of its predicament. For simplicity's sake, we consolidate SPI's myriad challenges into four overall lines of argument, and consider them *seriatim.*

### A. *Negligence.*

In what amounts to a quintessential play on words, defendant admits the impregnability of the finding that Winslow "should not have proceeded in the light of the weather forecast and [should have] turned the flotilla around earlier," Appellant's

Brief at 29, yet strongly denies that this conduct was actionably negligent. *Id.* That is so, appellant tells us, because poor seamanship is suable only if the master's fault is "gross and flagrant." *Id.* (quoting *The Imoan,* 67 F.2d 603, 605 (2d Cir.1933)). The proposition is founded on a myth.

■ A ship's master has considerable discretion, but it is not unbridled. Reasonable prudence is reasonably to be expected. The master of a tug is required to exercise "reasonable care and maritime skill" with respect to the vessel in tow. *Stevens v. The White City,* 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932); *The Eastern,* 280 F. 711, 713 (2d Cir.1922). That is to say, notwithstanding the captain's discretion, an action will lie if he "ma[kes] a decision which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at the time and under the circumstances." *The Lizzie D. Shaw,* 47 F.2d 820, 822 (3d Cir.1931); *see also Massman Construction Co. v. Sioux City & New Orleans Barge Lines, Inc.,* 462 F.Supp. 1362, 1366 (W.D.Mo.1979). Among other things, the master has a clear duty to monitor and take into account weather conditions. *See, e.g., Boudoin v. J. Ray McDermott & Co.,* 281 F.2d 81, 84–86 (5th Cir.1960); *Graham v. Milky Way Barges, Inc.,* 590 F.Supp. 721, 728 (E.D.La.1984), *rev'd in part on other grounds,* 824 F.2d 376 (5th Cir.1987).

■ The appropriate standard of care was obviously transgressed here. Winslow departed port in utter disregard of an aposematic forecast, and then stayed overlong in worsening seas before turning back. In our view, this was negligence of a rather egregious sort. *See McDermott,* 281 F.2d at 84 ("it is the nature of the calling of the shipmaster to know of the tempestuous forces of wind and tide and sea").

Appellant's reliance on *The Imoan* for a more permissive standard is misplaced. To be sure, the opinion contains the bald state-

---

1. For the benefit of landlubbers among us, the author included, the "rake" is generally thought to be "the overhang of a ship's bow or stern." Webster's Third New Int'l Dictionary 1877 (1981).

ment that "error to become fault must be gross and flagrant." 67 F.2d at 605. Yet that comment cannot serve defendant's ends for three separate reasons. First, the language is pure dicta. Second, *The Imoan* trails in the wake of over half a century of more modern caselaw, virtually all of it stipulating that the master's duty, in the Court's phrase, is one of exercising "reasonable care and maritime skill," *Stevens*, 285 U.S. at 202, 52 S.Ct. at 350, consistent with knowledge and circumstance. Lastly, *The Imoan* is distinguishable on the facts. There, the captain was suddenly confronted with unanticipated emergency conditions, not of his own contrivance. *See* 67 F.2d at 604 ("When the tug left [port] there were no indications of dangerous weather known to her.") That is far different from the matter at bar, where Winslow cavalierly decided to brave forecasted conditions, thereby imperilling the flotilla. The true lesson of *The Imoan* is that, when an unforeseen emergency arises, the master's response is actionable if it falls "outside the range of possible discretion." *Id.* at 605. The case before us, however, is not one where criticism is to be tempered because the master was acting *in extremis. See Capt'n Mark v. Sea Fever Corp.*, 692 F.2d 163, 168 n. 3 (1st Cir.1982) (*in extremis* doctrine applies when party claiming its protection was free from fault until emergency arose); *Bucolo, Inc. v. S/V Jaguar*, 428 F.2d 394, 396 (1st Cir.1970) (same). Winslow acted in response not to a sudden emergency but a predicted one, placing his convoy in readily foreseeable jeopardy, heedless of recognizable risks. His recklessness was so alien to prudent seamanship that it exceeded the boundaries of proper discretion by a wide margin.

We apply the *Stevens* standard here. Scrutinized in that light, the law and the evidence emphatically support the magistrate's finding that Winslow was negligent in taking the craft into seas much too heavy, and stubbornly keeping her there much too long.

## B. *Causation.*

█ SPI's principal fallback position is that Winslow's conduct, even if negligent, did not cause the structural damage to the rake. Our assessment of this point begins —and ends—with the scope of review. In the usual case, questions of causation (including those which involve evaluative applications of legal norms to discerned facts) are for the trier. As we recently noted:

> Application of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder.

*Swift v. United States*, 866 F.2d 507, 510 (1st Cir.1989); *see also Springer v. Seamen*, 821 F.2d 871, 876 (1st Cir.1987). In maritime cases, we review factbound findings stemming from a bench trial in accordance with the "clearly erroneous" principle of Fed.R.Civ.P. 52(a). *See McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954); *Clauson v. Smith*, 823 F.2d 660, 661 (1st Cir.1987); *Boudoin*, 281 F.2d at 82. Doing so reveals without serious question that the magistrate's adjudication of proximate cause stayed well on course.

Having explored every nook and cranny of the record, we abjure a lengthy exegesis. It suffices, we suggest, to observe that the magistrate supportably found that the Greenwood, before leaving Detroit, "was wholly seaworthy and fit for the tow;" that the flotilla encountered "no heavy weather or seas" en route to Montreal; that, when entrusted to SPI, the barge "was in seaworthy condition;" and that "[t]he only evidence of rough seas or ... oncoming seas over 2–3 feet" was during the October 15–16 episode off Port Hawkesbury. The magistrate specifically credited the testimony of Jan Bijhouwer, a naval architect, that "without a doubt [the damage to the rake was] caused by pounding, or slamming of the barge in waves or swells while under tow." Indeed, SPI's marine surveyor, Splettstoesser, while denigrating the barge's original condition, also testified that the damage resulted from the sea-state encountered during the towing operation. Putting two and two together, the magistrate arrived at four: the rough seas encountered outside Port Hawkes-

bury—seas which Winslow negligently elected to brave—caused the damage.

SPI attacks this conclusion as "mere conjecture," Appellant's Brief at 24, arguing the possibility that the damage occurred prior to that portion of the trip or at the time the rake actually fragmented. This buzznacking, however, is little more than rhetoric, totally misperceiving the factfinder's role. In a civil trial, one need not prove facts beyond all doubt. Notwithstanding the host of possibilities present in this case, the relevant evidence, albeit circumstantial, was quite powerful, leading almost inexorably to the very conclusion which the magistrate drew. Having heard the witnesses, considered the evidence, made credibility judgments, and drawn inferences from it all, the magistrate rejected the possibilities which SPI hawked (then, as now) and selected the probable cause of the mishap. This was the judicial process at work. "There were various permissible views of the proof—and it was the [magistrate's] prerogative, indeed, his duty, to choose among them." *Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1027 (1st Cir. 1988).

We have said before, and once again reaffirm, that "[w]here the conclusions of the [trier] depend on its election among conflicting facts or its choice of which competing inferences to draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error." *Irons v. FBI*, 811 F.2d 681, 684 (1st Cir.1987). There was no obvious mistake in this instance. To the contrary, the lower court's assessment of the likelihoods—that the rake was probably damaged during the October 15–16 incident—derives adequate support in the record and coincides with a commonsense appraisal of the situation.

### C. *Contributory Negligence.*

■ Defendant next asserts that its share of the liability (and the consequent damages) should have been reduced because, and to the extent, of correlative fault on DiMillo's part. Although the tenet which SPI advocates has respectable theoretical underpinnings, *see, e.g., Bryant v. Partenreederei–Ernest Russ*, 352 F.2d 614, 615 (4th Cir.1965) (in admiralty, "contributory negligence is properly considered in mitigation of damages") (collecting cases); *Missouri Portland Cement Co. v. Walker Barge Fleeting Service, Inc.*, 561 F.Supp. 12, 14 (W.D.Ky.1982) (in tow case, "proper to allocate damages based on comparative fault of the parties"), it has no actual application on the facts as found. We explain briefly.

Defendant floated the spectre of plaintiff's fault in an amended answer, sailed unsuccessfully under that flag at trial, and raised it again by a timely motion to alter the judgment. SPI's posttrial memorandum sculpted the twin poles upon which the banner was hoisted: plaintiff's contributory negligence in "failing to provide a seaworthy barge, [and] improperly preparing the barge, specifically, not ballasting [her]...." However, neither furculum of the theory was proven. The magistrate found specifically that "[t]he barge Greenwood was in seaworthy condition when it left ... Montreal for the trip to Portland," and that, though weight was not added, "[t]he failure to ballast the barge was not negligent." We have examined every bit of evidence and have no hesitancy in pronouncing these findings to be sustainable.

We could at this point launch a thoroughgoing summarization of the record, but to no real avail. The parties know as well as we do what inferences the proof permits; the magistrate canvassed matters with care and elaborated his reasoning sufficiently; and the case is so fact-specific that piecing together the evidentiary puzzle would serve no precedential purpose. There is no rule which requires an appellate court to string together facts solely because an intractable litigant chooses to challenge factbound determinations whose provenance is impeccable. In our judgment, it is enough merely to acknowledge that, after a bench trial:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though

convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). This trial was the very paradigm of the *Anderson* model. The seaworthiness argument is clearly unworthy, and the ballasting argument is at best a makeweight. On this record, we have no reason to secondguess the magistrate.[2]

### D. *Damages.*

Appellant's final shot across the Greenwood's bow addresses the amount of the award. We recapitulate the pertinent findings and then survey the applicable law.

In this instance, the magistrate determined that the barge was a constructive total loss. The applicable law is not in doubt:

> Where a vessel is totally lost, the measure of damages is its value at the time of loss, plus interest and the net freight pending at the time. . . .

*A & S Transp. Co. v. Tug Fajardo,* 688 F.2d 1, 2 (1st Cir.1982); *see also The Umbria,* 166 U.S. 404, 421–22, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1897); *The Anna Maria,* 15 U.S. (2 Wheat.) 327, 335, 4 L.Ed. 252 (1817); *Hewlett v. Barge Bertie,* 418 F.2d 654, 657 (4th Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1261, 25 L.Ed.2d 531 (1970); *O'Brien Bros., Inc. v. The Helen B. Moran,* 160 F.2d 502, 506 (2d Cir.1947). In this case, our concern is value plus interest; DiMillo has not appealed the magistrate's ruling disallowing lost profits and limiting damages "to the value of the vessel at the time of the loss, plus interest, there being no net freight pending in this case." *Di-*

*Millo v. SPI,* Civ. No. 86–0241–P, Order on Motion in Limine (D.Me. Sept. 9, 1987), at 4. We turn, then, to the question of value.

The magistrate found the fair market value of the barge, undamaged, to have been $166,597.99, and the cost of repairs to be $175,000.[3] Then, despite his September 9, 1987 pretrial ruling, *see supra,* the magistrate awarded DiMillo repair costs ($175,000) plus prejudgment interest. He erred in so doing.

In the case of a vessel—as in the case of virtually any chattel—a constructive total loss occurs when the cost of repairing the ship is greater than its fair market value immediately before the casualty. *Self Towing, Inc. v. Brown Marine Serv., Inc.,* 837 F.2d 1501, 1506 (11th Cir.1988); *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.,* 792 F.2d 489, 491 (5th Cir. 1986); *cf. Gass v. Agate Ice Cream, Inc.,* 264 N.Y. 141, 143, 190 N.E. 323, 324 (1934) (loss of automobile). The situation at bar slipped neatly within this integument inasmuch as repair cost exceeded market value. And the parties did nothing by way of contract or conduct to seal off or redesign the aperture. Certainly, the fact that plaintiff refrained from obtaining his own insurance in reliance on defendant's assumed liability, Mag. Op. at 3, 15–16, was not enough to vary the measure of damages. *See Asphalt Int'l, Inc. v. Enterprise Shipping Corp.,* 667 F.2d 261, 266 (2d Cir.1981) (existence of insurance coverage immaterial to computation of market value for constructive total loss purposes); Sharpe and Acomb, *Damages Recoverable in Collision and Standing Cases, reprinted in* Damages Recoverable in Maritime Matters, ABA Standing Comm. on Admiralty and Maritime Law, Tort and Ins. Prac. Sect. 1, 4 (1984) ("Hull insurance proceeds

---

**2.** The parties have lately exchanged positions on the need for ballast. Below, plaintiff argued that SPI should not have undertaken the tow without ballasting the barge. In rejoinder, defendant presented expert testimony, in the person of Captain Kearns, which apparently persuaded the magistrate that the prevailing maritime standard of care did not require ballasting. Before us, tergiversation has become the order of the day. Defendant, citing plaintiff's experts, poses as an unabashed advocate of ballasting. DiMillo has done a comparable about-face, dismissing the necessity of such a precaution. As we have remarked before, "irony is no stranger to the law." *Amanullah v. Nelson,* 811 F.2d 1, 18 (1st Cir.1987).

**3.** On appeal, neither party challenges the accuracy of these figures.

operate largely outside the constructive total loss valuation scheme.").

The rule governing damages in such a context is crystal clear: the value of the vessel, plus interest thereon, comprises a ceiling on the recovery, notwithstanding that the cost of repairs is higher.[4] *See Hewlett,* 418 F.2d at 657; *O'Brien Bros.,* 160 F.2d at 506; Sharpe and Acomb, *supra,* at 4. Put another way, there can be no recovery beyond fair market value for the cost of repairs. Therein lay the magistrate's initial mistake.

There was, moreover, a second problem with the computation. The evidence was uncontradicted that the Greenwood, after the mishap, had a salvage value of $11,000. *See* Mag. Op. at 10. From the days of Chief Justice Marshall, it has been recognized that, where a vessel is adjudged a complete loss, the damages will be derived by calculating the vessel's value and deducting therefrom the salvage proceeds, if any there be.[5] *The Anna Maria,* 15 U.S. (2 Wheat.) at 335. *See also B & M Towing Co. v. Wittliff,* 258 F.2d 473, 475 (5th Cir. 1958) (where vessel a constructive total loss, "the measure of damages is the market value ... less the value of the salved equipment or materials"); *O'Brien Bros.,* 160 F.2d at 506 (damages for constructive total loss "would be the value of the vessel at the time of the collision less any value of the wreck as salvage, ... [plus] interest on the net amount from the date of the collision"); Sharpe and Acomb, *supra,* at 1. In this case, the magistrate should have accounted for this residuary element, but did not.

Despite these shortcomings in the assessment of plaintiff's damages,[6] no new trial is required. The computational defects are mere matters of arithmetic, easily remediable on the basis of undisputed facts. DiMillo's maximum recovery was approximately $155,598 (the Greenwood's value before the loss, as fixed by the trier, less the agreed salvage value). On remand, therefore, the district court need only enter a revised judgment for plaintiff in that sum, together with prejudgment interest from date of loss, postjudgment interest as allowed by law, and such costs as may be taxed below.

### III

We need go no further. The decisional chains which SPI finds chafing are in the main unbroken by its fitful paroxysms. The judgment appealed from is affirmed in all respects, except that the district court, on remand, shall trim the amount of the award in accordance with Part II(D) of this opinion. No costs on appeal.

*So Ordered.*

---

**4.** We are careful to limit our holding to *permanent* repairs. Temporary repairs, of an emergency nature, necessary to minimize damage, evaluate condition, conserve the property, or effectuate compliance with safety statutes, might be recoverable in a proper case as incidental damages. *E.g., O'Brien Bros.,* 160 F.2d at 506 (expenses of raising sunken barge allowed in total loss case). That, however, is beside the present point; no claim has been made for any such repairs in the course of this appeal.

**5.** The owner, of course, could choose instead to abandon the salvage to the defendant. *The Anna Maria,* 15 U.S. (2 Wheat.) at 335; *cf.*

*Asphalt Int'l,* 667 F.2d at 265 (discussing conceptual roots of constructive total loss doctrine). DiMillo elected to retain the damaged barge.

**6.** It is arguable that appellant, while explicitly assigning error to the omission of a salvage value offset, neglected sufficiently to raise the discrepancy between repair costs and market value. Though lacking in artfulness, we think appellant's proffer was marginally adequate to call the entire computation of damages into question. Moreover, the error being a basic and patent one, the interests of justice are better served by addressing and correcting it.