SAILOR INCORPORATED
F/V, Plaintiff

v.

CITY OF ROCKLAND, Defendant

No. CIV.03–261–P–H.

United States District Court,
D. Maine.

June 16, 2004.

Clayton N. Howard, Howard & Bowie, Damariscotta, Me, for Sailor Incorporated F/V, Plaintiff.

William H. Welte, Welte & Welte, P.A., Camden, ME, for City Of Rockland, Defendant.

## ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

HORNBY, District Judge.

The plaintiff's fishing vessel sank while it was docked at the defendant's pier, allegedly due to the defendant's fault. The defendant seeks summary judgment on damages, limiting any recovery to the vessel's fair market value immediately before it sank. Under the applicable rule of mar- itime law, if the cost of repairing a vessel exceeds the vessel's pre-casualty fair market value, then the vessel is considered a "constructive total loss" and the owner may recover no more than its fair market value, *i.e.*, no damages for lost profits or loss of use. The undisputed evidence on this summary judgment record shows that the plaintiff's vessel was a constructive total loss. The plaintiff's potential damages are therefore limited to the fair market value of the vessel plus interest.[1] Accordingly, I GRANT the defendant's motion for partial summary judgment.

### BACKGROUND

I recite the facts in the light most favorable to the plaintiff, the nonmoving party. The plaintiff, F/V Sailor, Inc. ("Sailor"), owned a commercial fishing vessel, the F/V Sailor. It was tied up and docked at a fish pier wharf owned and operated by the defendant, City of Rockland ("the City"). On February 16, 2004, the F/V Sailor sank while moored alongside the City's pier allegedly because a bolt protruding from the wharf punctured the vessel's hull. At the time of her sinking, the F/V Sailor was covered under a marine hull insurance policy for an "agreed value" of $50,000. The fair market value of the vessel immediately prior to her sinking was between $150,000 and $180,000.[2] The vessel's fishing permits were worth approximately $190,000.

After the vessel sank, Sailor asked Wayfarer Marine, Inc. to estimate the repairs necessary to return the vessel to its presinking condition. Wayfarer Marine provided an estimate that totaled $187,543. Gary Hatch, Sailor's president and a desig-

---

1. The constructive total loss doctrine actually limits the damages to fair market value *less salvage value*. *DiMillo v. Sheepscot Pilots*, 870 F.2d 746, 751 (1st Cir.1989). Since the defendant does not address the salvage value, neither do I.

2. Gary Hatch, Sailor's president, estimated that the vessel's fair market value was between $150,000 and $180,000. The City admits to this value for the purposes of this summary judgment motion only. Def.'s Mot. for Summ. J. at n. 1.

nated expert in this case, was able to float the F/V Sailor and get her running again without doing all the repairs included in the Wayfarer Marine estimate. The record does not reflect how much Sailor actually spent repairing the vessel.

Sailor sold the F/V Sailor to Cajee, Inc. for $25,000 "as is, where is," and replaced the F/V Sailor with another fishing vessel, named Shearwater. Sailor then transferred the fishing permits to Shearwater.

Sailor filed a lawsuit against the City in state court on February 26, 2002. The City removed the suit to federal court on November 10, 2003. Sailor asserts claims for breach of contract, negligence, and breach of a joint venture agreement. Sailor seeks damages in excess of $1,165,602, including damages for lost profits, consequential damages, and out-of-pocket expenses. The City moved for partial summary judgment to limit damages to the fair market value of the vessel before sinking.

ANALYSIS

■ The parties agree that maritime law applies. Under maritime law, "[a] vessel is considered a constructive total loss when the cost of repairs is greater than the fair market value of the vessel immediately before the casualty." *E.g., Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489 (5th Cir.1986); *DiMillo v. Sheepscot Pilots*, 870 F.2d 746, 751 (1st Cir.1989). When a vessel is a constructive total loss, damages for loss of use are not recoverable; "the value of the vessel, plus interest thereon, comprises a ceiling on recovery ...." *DiMillo*, 870

F.2d at 752. *See also A & S Transp. Co. v. The Tug Fajardo*, 688 F.2d 1, 2 (1st Cir.1982).

The City argues that the F/V Sailor was a constructive total loss because the cost of restoring the vessel to its pre-casualty condition exceeds the vessel's pre-casualty fair market value. Sailor argues: (1) that the vessel was salvaged and therefore was not a constructive total loss; (2) that the value of the fishing permits must be included in the vessel's fair market value for the purpose of determining whether the vessel was a constructive total loss; and (3) that, although the *estimated* cost of repairing the vessel exceeded the vessel's fair market value (without the fishing permits), the *actual* cost of repairs did not.[3]

### (1) Salvage

■ Sailor asserts that "[s]ince F/V Sailor was salvaged, no constructive total loss can exist." However, salvage and salvage value do not figure into the constructive total loss equation. Whether a vessel is a constructive total loss depends solely upon whether the cost of repairing the vessel exceeds its pre-casualty fair market value. *DiMillo*, 870 F.2d at 751. When a vessel is a constructive total loss, damages are limited to the vessel's fair market value immediately before it sank, less any salvage proceeds. *Id.* at 752 ("From the days of Chief Justice Marshall, it has been recognized that, where a vessel is adjudged a complete loss, the damages will be derived by calculating the vessel's value and deducting therefrom the salvage proceeds, if any there be."). *See also* Michael A. Snyder, *Maritime Collision Damage to*

---

**3.** Sailor also argues that the vessel cannot be deemed a constructive total loss because the vessel was not abandoned. Sailor cites *Fuller v. State Farm Fire & Casualty Co.*, 721 F.Supp. 1219 (M.D.Ala.1989), for the proposition that abandonment is necessary to find

constructive total loss. That case dealt with a marine insurance policy and the requirement that, to recover insurance proceeds for a constructive total loss, an insured must abandon the vessel *to the insurance company*. It has no application here.

*Vessels and Fixed Structures*, 72 Tul. L.Rev. 881, 905 (1997) ("If the victim was also entitled to retain the wreck, it would have been made more than whole, for it would have everything it had before the collision plus a wrecked vessel having some value, if only for scrap. Therefore, the law requires that ... a deduction must be made for the salvage value of such party of the vessel or its equipment which remain.").[4] Thus, the F/V Sailor's salvage and sale are relevant only to the amount of damages that Sailor may ultimately recover, not to whether the vessel was a constructive total loss.

### (2) Fishing Permits

In its response statement of material facts, Sailor says that $190,000 must be added to the vessel's fair market value to reflect the value of the fishing permits. That addition would increase the fair market value above the repair costs and therefore, Sailor argues, prevent a finding of constructive total loss. The City argues that, since the plaintiff retained the permits and transferred them to another vessel after the F/V Sailor sank, including the permits in the vessel's value would give Sailor a windfall.

The parties do not cite, and I have not found, any cases discussing whether fishing permits contribute to a vessel's fair market value for the purpose of determining whether the vessel is a constructive total loss. The First Circuit has held that maritime liens against a fishing vessel extend to its permits as well. *Gowen, Inc. v. F/V Quality One*, 244 F.3d 64, 68 (1st Cir.2001). And it may be customary in the trade to include fishing permits in the sale of a fishing vessel. *See* 50

C.F.R. § 648.4(a)(1)(D) (a fishery management provision directed at multi-species fishing vessels provides that permits are presumed to transfer with the vessel). Those contexts, however, present different issues than application of the constructive total loss doctrine. The economic efficiency aspect of the constructive total loss doctrine is obvious. The doctrine discourages an owner from repairing a vessel that can be replaced for less money than the repair would cost, and will not permit an owner to recover lost profits when he or she should have expeditiously purchased a substitute vessel and continued the vessel's profit making activities. The relevant measure of value against which to measure the repair costs in determining constructive total loss is therefore the value of the physical vessel, not of "appurtenances" like fishing permits that are transferable to other vessels. Including them would encourage economically inefficient choices, such as repairing vessels when they could be replaced for less money. Here, Sailor did not lose its fishing permits, but successfully transferred them to a new vessel. The value of the fishing permits, which were not impaired due to the sinking, is not properly includible in the vessel's fair market value for the purpose of determining whether the vessel was a constructive total loss.

### (3) Actual Cost of Repairs

The caselaw suggests that, when available, the actual cost of repairing the vessel is the appropriate measure. *See, e.g., Ryan Walsh Stevedoring Co.*, 792 F.2d at 491 ("The district court arrived at [the cost of repairing the vessel] by adding the cost of physical repairs to the barge ... to the

---

4. The case cited by the plaintiff, *In re D.N.H. Towing*, 1998 WL 404641, *2, 1998 U.S. Dist. LEXIS 11110 (E.D.La. July 17, 1998), does not hold otherwise. In that case, the district court denied summary judgment because there were genuine issues of material fact surrounding the value of the vessel and the cost of its repair. *Id.* at *2.

replacement cost of the crane."); *Lenfest v. Coldwell*, 525 F.2d 717, (2d Cir.1975) ("[T]he trier of fact must scrutinize with care anticipated expenses, making an independent determination of what the expenses really would have been .... Here the claimed expenses were in large part actually incurred by the owners and the determination of which of these expenses, if reasonable, should be allowed is a question of law.").

Sailor asserts that the actual "cost of repairs to refloat F/V Sailor and to return her to fishing service did not exceed the fair market value of the vessel immediately prior to sinking. The actual repairs to the F/V Sailor were less than the fair market value of the vessel, without the permits, of at least $150,000 ...." Pl.'s Resp. SMF ¶ 11. Sailor cites Hatch's affidavit of April 28, 2004, for support. In his affidavit, Hatch says that certain of the estimated repairs were unnecessary and that, without those repairs, the Wayfarer Marine estimate would only have been approximately $112,043. Hatch also asserts:

> Based upon my education, training, experience, expertise and also based upon surveys that I have conducted including my personal involvement in implementing, overseeing, and actually undertaking most of the repairs, it is my opinion that the cost of repairs necessary to restore the F/V Sailor to the condition she was in immediately prior to the sinking on February 16, 2002, did not exceed the fair market value of the vessel immediately prior to that sinking.... It is my further opinion that the F/V Sailor was not rendered a constructive total loss due to the sinking of February 16, 2002.

Hatch Aff. ¶¶ 7–8. If credited, these assertions would create a genuine issue of material fact on the dispositive issue of constructive total loss. But the City ar-

gues that I should disregard these portions of Hatch's affidavit because they conflict with his deposition testimony.

At his earlier deposition on March 2, 2004, Hatch was asked several questions regarding the cost of repairing the F/V Sailor and whether the vessel was a constructive total loss:

Q: Would you characterize the—what happened to the Sailor when it sunk at the fish pier in Rockland in February of 2002 as a total loss of the vessel?

A: Constructively, yes.

Q: And by that constructive total loss, are you referring to the fact that the cost of the repairs as set out in exhibit 6 when totaled exceed the fair market value of the vessel that you have given between 150 and 180?

A: Equal to or exceed, yes.

Q: I roughly did it. It looks like 186.

A: Yes.

Q: Would you agree that the cost to repair the vessel to bring her back to the condition she was in prior to the sinking exceeded the 150 to 180 figure that you gave me?

A: Yes.

Hatch Dep. 65:24–66:15. "Exhibit 6" was the Wayfarer Marine estimate, which totaled $187,543. When asked whether the number reflected on exhibit 6 "represents what it would take to put the vessel back into the condition it was in prior to the sinking," Hatch answered "yes." *Id.* 58:3–7. When asked whether he had "any repair work done to the Sailor after the sinking," Hatch answered that he had and described the work done as follows: "We had it hauled and the hull damage fixed so that the boat would float, and other than that, it was just work that I did clearing the boat up from oil damage and stripping the wiring and all the electronics off the

boat, all the damaged equipment off the boat." *Id.* 60:12–21. "I just basically brought it up to floating status and able to move around on her own power but in no means seaworthy." *Id.* 62:19–21.

Under First Circuit caselaw, "when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13 (1st Cir.2000). *See also Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 5 (1st Cir.1994). In both *Torres* and *Colantuoni*, the First Circuit found it "significant" that the parties submitted their affidavits "only after the defendants had filed motions for summary judgment." In *Colantuoni*, the court also emphasized that the plaintiff's "attorney was present at the deposition, and had the opportunity to clarify any incorrect responses." *Id.*

■ First, I note that Hatch's affidavit does *not* say that the actual cost of repairing the F/V Sailor was $112,043. Hatch says that, when the portion of the estimate attributable to the main engine and reduction gear is eliminated, the estimate is reduced to approximately $112,043. Nothing in the record establishes the cost of repairs actually done to the F/V Sailor. Moreover, nothing in the Hatch affidavit says that the vessel could be returned to its pre-sinking condition for $112,043. All Hatch says is that he did not replace the main engine or reduction gear and that those parts were in "running condition" when he sold the vessel. This is consistent with his deposition testimony ("I just basically brought it up to floating status and able to move around on her own power but in no means seaworthy"). There is, however, a clear contradiction between Hatch's

deposition testimony and his affidavit. In the deposition, Hatch said that the vessel was a constructive total loss because it could not be repaired for less than $180,000. His affidavit directly contradicts that testimony in saying that the F/V Sailor *could* be returned to its pre-casualty condition for an amount less than the vessel's fair market value and that the vessel was *not* rendered a constructive total loss due to the sinking of February 16, 2002.

As in *Torres* and *Colantuoni*, Sailor submitted the affidavit in this case only after the City filed its motion for summary judgment. The questions posed to Hatch at his deposition were unambiguous and Hatch's answers ("yes") were clear. Moreover, Sailor's lawyer was present during the deposition to clear up ambiguities or clarify Hatch's answers. Hatch does offer an explanation for the obvious contradiction between his deposition testimony and his affidavit. Hatch claims that he thought he was being asked about an insurance issue at his deposition. Hatch explains:

> I was asked in a deposition if I considered the boat to be a total loss, and I answered "constructively, yes." In the discussions concerning the settlement for the hull insurance policy, I was paid the amount of the hull insurance in full less the deductible because the estimated repairs at that time exceeded the insured value. I understood I was being paid the total amount as a constructive type loss, and I did not understand that term had a specific legal meaning beyond the insurance issue.

Hatch Aff. ¶ 11.

I am not persuaded. First, although Hatch was asked a series of questions about the insurance settlement immediately before the questions on constructive total loss, fair market value and repair costs, those latter questions clearly were not re-

lated to insurance. The insured value of the vessel's hull was only $50,000. At his deposition, Hatch was asked whether the cost of repair exceeded the *actual value of the vessel,* not the insured value. The defendant's lawyer even referred to the vessel's fair market value, $150,000–$180,000, in his question. Hatch was then asked the unambiguous question whether the repair costs exceeded the $150,000–$180,000 value of the vessel, and Hatch clearly answered "yes." Moreover, Hatch is a marine surveyor and has been designated by the plaintiff as an expert witness in this lawsuit.

Hatch's later affidavit statement that the vessel was not a constructive total loss contradicts his earlier clear deposition testimony and Hatch has not offered a satisfactory explanation for the contradiction.[5] Accordingly, I do not consider the contradictory affidavit statements in ruling on the City's motion.

The parties agree (for the purpose of this motion) that the F/V Sailor was worth between $150,000 and $180,000 before it sank. Without the statements in Hatch's affidavit, there is no dispute that it would have cost $187, 543 to restore the vessel to its pre-sinking condition. Because the cost of repairing the F/V Sailor exceeded its fair market value at the time that it sank, the vessel was a constructive total loss. Accordingly, Sailor's damages are limited to the fair market value of the vessel, plus interest.

### CONCLUSION

The fair market value of the F/V Sailor immediately prior to its sinking was between $150,000 and $180,000. The estimated cost of repairing the F/V Sailor was $187,543. There is no evidence in the record that the F/V Sailor was actually restored or could have been restored to its pre-casualty condition for less than that amount. The F/V Sailor is a constructive total loss because the cost of repairing the vessel exceeds even the highest estimate of its pre-sinking fair market value. Sailor's potential damages are therefore limited to the fair market value of the vessel, plus interest. The City's motion for partial summary judgment is GRANTED.

So ORDERED.

---

5. In addition, Hatch's opinion now that the vessel was not a constructive total loss is unsupported. Hatch does not offer any testimony as to what it would cost to return the

F/V Sailor to its pre-sinking condition. The City does not argue that Hatch's expert opinion fails for lack of foundation, however.