USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1727 TRANSAMERICA PREMIER INSURANCE COMPANY, Plaintiff - Appellee, v. THOMAS J. OBER, ET AL., Defendants - Appellees. ____________________ EL/CAP TOWING & TRANSPORTATION, INC., Defendants - Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Cyr and Boudin, Circuit Judges. ______________ _____________________ Elizabeth S. Morley, with whom William W. Willard, _____________________ _____________________ Bernstein, Shur, Sawyer & Nelson, Louis G. Juliano and Bigham, _________________________________ ________________ _______ Englar, Jones & Houston were on brief for appellant. _______________________ Stephen M. Martin, with whom Dante Mattioni, Francis X. __________________ _______________ ___________ Kelly and Mattioni, Mattioni & Mattioni, Ltd. were on brief for _____ ____________________________________ appellee C&G Excavating, Inc. ____________________ February 28, 1997 ____________________ TORRUELLA, Chief Judge. Crossclaim Defendant-Appellant TORRUELLA, Chief Judge.  ___________ El/Cap Towing and Transportation, Inc. ("El/Cap") appeals from a jury verdict finding it and co-crossclaim Defendant Henry Marine Services, Inc. ("Henry Marine") liable to appellee C&G Excavating, Inc. ("C&G") for negligence in towing various vessels and properties belonging to C&G. Arguing an insufficient showing of legal causation, El/Cap contends that the trial court erred by denying its motions for a directed verdict. In the alternative, El/Cap argues that the district court erred by not providing the jury a more specific special verdict form, and by denying El/Cap's Motion for a New Trial or for Amendment of Judgment. Finding no error, we affirm. BACKGROUND BACKGROUND El/Cap and Henry Marine were two of several companies that participated in towing C&G equipment to a dredging project in Saco, Maine.1 C&G claimed that El/Cap and Henry Marine, while towing, negligently caused the following damages to C&G property: damage to a dredge (the AMBER II), loss of a tender boat (the LITTLE GEORGE), loss of some pipeline, and loss of a pipe barge. C&G's negligence claims were brought before the district court of  ____________________ 1 This suit initially surfaced against the backdrop of a variety of legal disputes between contractors and the Transamerica Premier Insurance Company, which had issued performance bonds for the payment of various contractors involved in a dredging project in Saco, Maine. C&G owned equipment used in the dredging project. All claims were settled before trial with the exception of the crossclaims between C&G and El/Cap and Henry Marine that are before us now.  -2- Maine under both diversity jurisdiction, 28 U.S.C. 1332, and maritime jurisdiction, 28 U.S.C. 1333.  Many of the facts essential to a finding of negligence were vigorously contested by the parties at trial. Because a jury found El/Cap and Henry Marine liable, we must view the facts in the light most favorable to C&G, draw all reasonable inferences in C&G's favor, and refrain from assessing either the credibility of witnesses or the relative weight of evidence. Lama v. Borr s, 16 F.3d 473, 475 (1st Cir. 1994). As reviewed in ____ ______ this light, the tale proceeds as follows. In November 1992, C&G entered into a Bareboat Charter Agreement with East Coast Marine whereby East Coast Marine leased C&G equipment it needed for the Saco, Maine, dredging project. Specifically, East Coast Marine hired the AMBER II, the LITTLE GEORGE, the pipe barge, and some pipeline (together, "the equipment") from C&G. Although East Coast Marine had initially hired El/Cap to tow the equipment from Lewes, Delaware, to Saco, Maine, Henry Marine was ultimately given the towing job. In their transport arrangements with Henry Marine, East Coast Marine and C&G instructed that the equipment must be towed along the intracoastal waterway.  Heading north in the intracoastal waterway, Henry Marine met with delays and setbacks in successfully carrying out the tow. At Hereford inlet, for example, the Henry Marine boats ran aground and had difficulty navigating the equipment under certain bridges. At this point, El/Cap agreed to assist in the -3- tow, and arranged to have Henry Marine leave the intracoastal waterway and meet El/Cap's tug, the TOMMY G, in the open seas outside of Hereford Inlet.2 None of the equipment was damaged while towed by Henry Marine in the period prior to El/Cap's involvement in the tow. The decision to transfer the equipment during rough weather and to continue heading in the direction of New York despite rough weather was at the heart of this negligence suit. Although the evidence regarding who made this decision was conflicting, there was enough testimony for the jury to decide that El/Cap made the decision.  At the time El/Cap instructed the Henry Marine boats to bring the equipment to meet El/Cap's tug, the TOMMY G, the forecast called for four to six foot seas. The seas were rougher than forecast when Henry Marine brought the equipment out to the TOMMY G, and the AMBER II broke away from a Henry Marine tug. When the TOMMY G tried to secure the AMBER II, both the Henry Marine tug and the TOMMY G collided with, and caused damage to, the AMBER II. Further damage was caused to the AMBER II when, in the course of transferring pipeline to the TOMMY G's tow, a Henry  ____________________ 2 The record contains conflicting evidence regarding the decision to take the equipment out of the intracoastal waters and into the ocean. El/Cap draws our attention to testimony suggesting that it was forced to rescue the equipment negligently towed by Henry Marine, and that Henry Marine and C&G asked El/Cap for assistance and knowingly made a decision to leave the intracoastal waters. C&G, on the other hand, offered testimony showing that El/Cap arranged to meet the Henry Marine boats in the open sea. As discussed infra, there was sufficient evidence _____ for a jury to find El/Cap responsible for the shift to open sea travel.  -4- Marine boat struck the AMBER II again. The loss of the LITTLE GEORGE, which was tied to the AMBER II, occurred later.  Because of the rough weather, one Henry Marine tug, the RACHEL MARIE, agreed to continue to tow the pipeline and pipe barge to New York. The RACHEL MARIE needed to refuel, however, and El/Cap took control of the line from the pipe barge, tying it to the AMBER II, to allow the RACHEL MARIE to return to shore. The RACHEL MARIE communicated that it would return in approximately two hours. Instead of waiting for the RACHEL MARIE to return, the TOMMY G continued to head for New York, with all of the equipment in tow. The TOMMY G did not seek shelter during its voyage to New York. In rough waters, the LITTLE GEORGE broke loose, collided with the pipe barge, and sank. The LITTLE GEORGE was not an ocean-going vessel. Some pipeline was also lost en route to New York. When the TOMMY G arrived in New York, it was towing a damaged dredge (the AMBER II) and a damaged pipe barge that carried the remaining pipeline. In New York, El/Cap, through its principal, Dennis Elberth, who was also the captain of the TOMMY G, informed C&G that it would repair the pipe barge before it left El/Cap's control. After several days, the decision was made by East Coast Marine to continue transporting the remaining equipment to Maine. East Coast Marine called on El/Cap to continue towing the AMBER II. To tow the pipe barge and pipeline, which were not repaired by El/Cap, East Coast Marine's principal John Szegda hired two other towing companies. Local -5- Towing carried out the tow between New York and Gloucester, Massachusetts, at which point another firm, Bay State Towing, took over.  El/Cap towed the AMBER II to Saco, Maine without further incident. The pipeline and pipe barge sank off of the coast of New Hampshire while being towed by Bay State Towing, due to a hole in the barge initially sustained during the tow from Delaware to New York. El/Cap failed to repair the hole in the pipe barge before it left El/Cap's yard in New York.  At trial, the district court twice denied El/Cap's motions for directed verdict and also rejected El/Cap's proposed special verdict form. The jury awarded $221,300 to C&G, apportioning liability 88% to El/Cap and 12% to Henry Marine.3 That figure appears to reflect a finding of liability on all of the damages claimed by C&G, including the loss of the pipe barge and pipeline. Henry Marine did not appear for trial, but evidence regarding its negligence was presented to the jury and default judgment was entered against it. El/Cap appeals the denial of motions for directed verdict and for new trial, as well as the denial of its proposed special verdict form. In the alternative, El/Cap argues that the damage award should be reduced by $96,000 to reflect the fact that El/Cap is not liable for the loss of the pipe barge and pipeline. DISCUSSION DISCUSSION  ____________________ 3 In its cross claim pleadings, C&G alleged damages "in excess of $258,500."  -6- I. El/Cap's Motions for Directed Verdict and for New Trial  I. El/Cap's Motions for Directed Verdict and for New Trial El/Cap argues on appeal that the evidence at trial fails to demonstrate that El/Cap's actions were the legal cause of any of the damages suffered during the tow and, therefore, that the district court erred in denying El/Cap's motions for a directed verdict and for a new trial. Before assessing the merits of this argument, we note the pertinent standard of review -- one that is decisive in shaping the outcome of our assessment. In reviewing the denial of a motion for judgment as a matter of law under Rule 50(a), we conduct a plenary review of the evidence "viewed in the light most favorable to the non- movant, giving [it] the benefit of every favorable inference that may be fairly drawn therefrom." Santiago Hodge v. Parke Davis & ______________ _____________ Co., 909 F.2d 628, 634 (1st Cir. 1990) (citations omitted). "If ___ 'fair minded' persons could draw different inferences, then the matter is for the jury." Id. We will not reverse the trial ___ court's denial of defendant's Rule 50(a) motion unless the facts, seen in the light most favorable to the plaintiff, as well as inferences reasonably drawn therefrom "'lead to but one conclusion -- that there is a total failure of evidence to prove the plaintiff's case.'" Guti rrez-Rodr guez v. Cartagena, 882 ___________________ _________ F.2d 553, 558 (1st Cir. 1989) (quoting Mayo v. Schooner Capital ____ ________________ Corp., 825 F.2d 566, 568 (1st Cir. 1987)). Such is not the case _____ here, as we explain below.  The appellant's hurdle is no lower on an appeal of a denial of a Rule 59 motion for a new trial. We reverse only if -7- "'the verdict is so seriously mistaken, so clearly against the law or the evidence, as to constitute a miscarriage of justice. . . . This strict standard of review is especially appropriate if the motion for new trial is based on a claim that the verdict is against the weight of the evidence.'" Guti rrez-Rodr guez, 882 ___________________ F.2d at 558 (quoting MacQuarrie v. Howard Johnson Co., 877 F.2d __________ __________________ 126, 128 (1st Cir. 1989)(citations omitted)). Because El/Cap does not argue that the district court made an error as to the controlling law -- which would merit de novo review -- our review _______ is limited to determining whether the district court abused its discretion when it evaluated the verdict against the weight of the evidence and found no miscarriage of justice. Havinga v. _______ Crowley Towing & Transp. Co., 24 F.3d 1480, 1483 (1st Cir. 1994). ____________________________ In considering whether the district court's denial of El/Cap's Rule 50(a) motion was proper, we must view the facts that were vigorously contested in this case in the light most favorable to C&G. In reviewing the district court's denial of the Rule 59 motion, our review is also limited because we will only reverse if we find an abuse of discretion. We thus turn to examine the evidence before the jury on which a finding of negligence could be based. A. Applicable Substantive Law A. Applicable Substantive Law Under both Maine and well-established maritime law, "the master of a tug is required to exercise 'reasonable care and maritime skill' with respect to the vessel in tow." DiMillo v. _______ Sheepscot Pilots, Inc., 870 F.2d 746, 748 (1st Cir. 1989) _______________________ -8- (quoting Stevens v. White City, 285 U.S. 195, 202 (1932) (holding _______ __________ tug not liable as an insurer or common carrier)).4 Thus, longstanding maritime norms required El/Cap and Henry Marine to carry out the tow by using such reasonable care and maritime skill as prudent navigators employ for the performance of similar services.5 A court sitting in admiralty jurisdiction may look to the application of basic proximate cause standards as they have been elaborated by the states. Exxon Co., U.S.A. v. Sofec, Inc., _________________ ___________ 116 S. Ct. 1813, 1818 (1996). There is no conflict between pertinent maritime and Maine tort law in this case. Under Maine tort law, the causation element of the tort of negligence is satisfied if: (1) the act or failure to act played a substantial part in bringing about or actually causing the injury or damage, and (2) the damage was a direct result or reasonably foreseeable ___ result of the act or failure to act. Shaw v. Bolduc, 658 A.2d ____ ______ 229 (Me. 1995).  ____________________ 4 Our review of the jury instructions indicates that the district court correctly outlined the relevant features of applicable maritime tort law. The lack of Maine tort law that either contradicts any aspect of maritime tort law or pertains specifically to maritime torts bolsters the trial court's apparent reliance on general maritime law principles.  5 Neither party contends that maritime law should not apply. For a tort to be considered maritime, "it must meet two tests: the situs of the tort must be maritime (the location test) and the tort must bear a significant relationship to traditional maritime activity (the nexus test)." Carey v. Bahama Cruise _____ ______________ Lines, 864 F.2d 201, 207 (1st Cir. 1988) (citations omitted). _____ Both tests are plainly satisfied here. As discussed in Carey, _____ diversity jurisdiction does not imply that maritime law be displaced by state law. Id. at 206-07. ___ -9- The following rules of general maritime law shed ample light on the duty of reasonable care and maritime skill required of El/Cap in this case, and this appeal does not require any further expatiation of the law of the sea. The degree of caution or care required of the navigator of a tug is related to the nature of the tow -- in particular, the tugboat master must consider the suitability of the tow for travel in light of the condition of the seas encountered. The MERCURY, 2 F.2d 325, 326 ___________ (1st Cir. 1924); see also Howlett v. The Tug DALZELLIDO, 324 F. ________ _______ __________________ Supp. 912, 916-17 (S.D.N.Y. 1971) (reviewing general principles of law relating to towage). A tug's duty of reasonable care includes the duty to take into consideration weather conditions as they may affect the tow. Dimillo, 870 F.2d at 748; Chemical _______ ________ Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir. __________________ __________________ 1961). The captain of the tug is charged with knowledge of weather forecasts, whether or not he had actual knowledge of the forecasts. The Tug DALZELLIDO, 324 F. Supp. at 917. A breach of __________________ the duty of care thus can be found when a tug captain makes a decision that is unsafe in light of the weather conditions and the particular circumstances of the tow that could reasonably have been known. De Millo, 870 F.2d at 748. It is negligent, _________ for example, to knowingly brave weather conditions that may imperil a flotilla. Id. at 749. ___ C&G presented two sets of allegedly negligent acts for the jury's consideration. First, C&G claimed that damage to the AMBER II, and the loss of the LITTLE GEORGE, were caused by: (a) -10- El/Cap's decision to receive the tow from Henry Marine in the open ocean during inclement weather, and (b) El/Cap's failure to seek shelter after the transfer at Hereford Inlet. Second, C&G claimed that the loss of the pipe barge and pipeline was caused by El/Cap's failure to repair the pipe barge, as promised, in New York. Noting that "issues of proximate cause and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review," we arrive at the conclusion that a rational jury could have accepted C&G's two theories of negligence as supported by a preponderance of the evidence. See Exxon Co., U.S.A., 116 U.S. at 1819. Assuming the ___ _________________ jury credited testimony favorable to C&G, we hold that a rational jury could have found El/Cap negligent. B. Damage Sustained During the Tow to New York B. Damage Sustained During the Tow to New York On this appeal, El/Cap does not deny that the C&G vessels were ill-suited for open ocean travel,6 nor does El/Cap deny that the decision to transfer the tow and continue in open ocean during poor weather conditions was imprudent. Rather, El/Cap stresses the following two points regarding the damages to C&G property en route to New York: that El/Cap did not, in any way, participate in the decision to transfer the tow off of Hereford Inlet during stormy weather, and that the incompetence of Henry Marine led "inevitably to the losses claimed." Appellant's Brief at 14. According to El/Cap, it rescued the  ____________________ 6 C&G brought forward expert testimony in support of the finding that the various towed vessels were clearly unsuitable for open sea travel. Testimony of Ronald Campana, Tr. at 226-27.  -11- AMBER II from the incompetent hands of Henry Marine and brought it safely to New York. There may be some merit to El/Cap's argument. Nevertheless, an appellate court may not usurp the function of the jury, and thus we cleave to the facts in the light most favorable to C&G. The record indicates that the jury could have accepted contrary testimony as to each of these points emphasized by El/Cap. With regard to the decision to transfer a tow that was unsuited for open ocean travel in rough ocean waters and foggy conditions -- a decision that El/Cap appears to concede was negligent, see Appellant's Brief at 15 -- the jury could have ___ found that El/Cap shouldered responsibility based on the deposition testimony, read at trial, of Robert Henry, the principal of Henry Marine. Robert Henry averred that El/Cap's principal knew of the nature of the tow and agreed to take over the tow off of Hereford Inlet, and that the captain of the TOMMY G instructed that the tow be brought out to open sea for the purposes of the transfer. Exhibit 127 at 56-60; Tr. at 419. Although the Henry Marine boats collided with and damaged the AMBER II, this harm could be deemed a foreseeable result of undertaking an open ocean transfer under unsuitable weather conditions. The jury could have concluded that El/Cap knowingly decided to proceed with the transfer of towed vessels that are unsuited for open ocean travel, during rough weather. Such a conclusion is a sufficient ground for a finding of tort liability -12- as to the damage to the AMBER II, since the AMBER II suffered damage during the transfer. Additionally, C&G offered the expert testimony of an experienced marine captain who opined that the Henry Marine tugs were following the lead of El/Cap's dominant tug, and that El/Cap failed to maintain professional standards by performing the transfer under the circumstances. Testimony of Ron Campana, Tr. at 229-31. El/Cap's duty to exercise reasonable care and maritime skill required that attention be given to the special circumstances of this tow, and a reasonable jury could have found that they fell short of that duty by undertaking the transfer. Even assuming, as El/Cap argues, that the principals of C&G and East Coast Marine, eager to speed the towing process, decided that El/Cap should relieve Henry Marine of the AMBER II off of Hartford Inlet, this does automatically exonerate El/Cap from liability. The jury may even have accepted El/Cap's version of the events surrounding the decision to leave the intracoastal waterways and still found that the TOMMY G failed to carry out the tow prudently by participating in the transfer in poor weather. Under certain circumstances, the duty of reasonable care and maritime skill may require that a tug captain delay a tow, or otherwise make ad hoc adjustments to the course or schedule that was initially planned by its client. Cf. DiMillo, ___ _______ -13- 870 F.2d at 748-49 (tug should not have set out in bad weather).7 With regard to whether negligent acts by El/Cap were the legal cause of the damages after the transfer, the jury could have concluded that such damage flowed substantially from El/Cap's decisions and was not inevitably caused by Henry Marine's actions. Even assuming that the flotilla was "stranded in the Intercoastal Waterway as a direct result of the incompetence of Henry Marine," Appellant's Brief at 14, the jury could have found that El/Cap need not have proceeded to New York without stopping.8 C&G brought forward expert testimony indicating that the TOMMY G had the opportunity to seek shelter before the LITTLE GEORGE sank, but instead continued to head for New York harbor. Tr. at 231. The LITTLE GEORGE, unfit for ocean travel, was lost as it was being towed by the TOMMY G toward New York harbor. C&G's expert opined not only that the TOMMY G was the dominant tug, responsible for coordinating the actions of the  ____________________ 7 We also note that a storm did not suddenly arise in the course of the TOMMY G's tow and that El/Cap was, or should have been, aware of the weather conditions prior to undertaking the transfer. Therefore, El/Cap cannot argue that this is a case of a tug captain acting in extremis. See, e.g., Boudoin v. J.R. ___________ ___ ____ _______ ____ McDermott & Co., 281 F.2d 81, 84 (5th Cir. 1960) (distinguishing ________________ in extremis cases -- which require that "something more than mere ___________ mistake of judgment by the master" be shown if, "without prior negligence, a vessel is put in the very center of destructive natural forces" -- from case where tug captain knew of weather conditions before making decisions).  8 We note as well that the jury could have accepted that El/Cap's participation was needed while also concluding that it failed to use appropriate equipment for such a sea rescue, because the TOMMY G was not able to enter shallow coastal waters. -14- Henry Marine tugs, but also that the TOMMY G was responsible for the sinking of the LITTLE GEORGE. Tr. at 236. Thus, a rational jury could have found that the actions of the El/Cap tug, by not seeking safety, proximately caused the damages that occurred between Delaware and New York. C. Loss of the Pipe Barge and Pipeline  C. Loss of the Pipe Barge and Pipeline El/Cap promised to repair the holes in the pipe barge before allowing it to leave its yard in New York. C&G argued that the failure to make these repairs was a legal cause of the loss of the pipe barge and pipeline. El/Cap, however, argues that no jury could have found it liable for the loss of the pipe barge because, even if El/Cap promised to repair the pipe barge and failed to do so, the principal of East Coast Marine, John Szegda, removed the pipe barge from El/Cap's dock and subsequently assured the other towing companies that the pipe barge was seaworthy. According to El/Cap, such actions on the part of Szegda "must be viewed as breaking the chain of causation." We disagree.  El/Cap does not deny on appeal that the jury could conclude that the pipe barge ultimately sank as a result of damages that El/Cap had promised to repair. Thus, it is legal (or proximate) causation, and not factual causation, that is at issue. El/Cap's argument regarding legal causation is that East Coast Marine's assurances to later towers that the barge was seaworthy cuts off El/Cap's liability. That East Coast Marine would try to complete the tow of that pipe barge to Maine was -15- certainly foreseeable. And, furthermore, the jury could have reasonably concluded that Szegda's assurances of seaworthiness to the later towers were based on his belief that El/Cap had in fact repaired the pipe barge as promised. Although El/Cap did not affirmatively indicate to Szegda or C&G that it had fixed the pipe barge such that it was seaworthy, it remained silent. El/Cap concedes that Dennis Elberth "acquiesced in the removal of the pipe and barge from [El/Cap's] sea wall." Appellant's Brief at 18. This acquiescence, in the wake of a promise to repair the barge before permitting it to continue to Maine, may have led a rational jury to conclude that El/Cap breached its duty of care with regard to the pipe barge. Thus, despite the general rule that an owner of a tow is responsible for warranting its basic seaworthiness,9 we agree with the following statement made by the district court in the course of denying El/Cap's motion for a directed verdict:  [T]here is a basis upon which the jury could reasonably conclude from the evidence that El/Cap should not have released that pipeline in New York, especially after it had made a commitment to Mr. Todd that it would not do so until the repairs had been made.  Tr. at 318. It was within the province of the jury as factfinder to determine that El/Cap's acts and omissions proximately caused the sinking of the pipe barge and pipeline, even though El/Cap was not towing the barge when it sank. We note that El/Cap presented its argument regarding superseding causes of damage at  ____________________ 9 See, e.g., South, Inc. v. Moran Towing & Transp. Co., 360 F.2d ___ ____ ___________ __________________________ 1002, 1005 (2d Cir. 1966) (collecting cases). -16- closing argument. The jury's verdict, apparently granting full damages, can therefore be regarded as a rejection of this argument.10  All of these considerations lead us to conclude that the denials of El/Cap's motions for directed verdict and new trial are not tantamount to abuses of discretion. Because we do not displace the jury's finding of liability as to the pipeline and pipe barge, we also decline El/Cap's invitation to adjust the jury's damage determination to reflect no liability for the loss of the pipeline and pipe barge.11 II. Special Verdict Form II. Special Verdict Form Finally, El/Cap casts the trial court's rejection of El/Cap's proposed special verdict form as reversible error. If  ____________________ 10 Furthermore, at no time did El/Cap specifically request a jury instruction regarding whether certain factual findings (later acts) would imply a break in the chain of legal causation with regard to the damage to the pipe barge. Hence, under Federal Rule of Civil Procedure 51, El/Cap may not argue on appeal that the jury's attention should have been drawn more specifically to subsequent supervening causes of the pipe barge's loss. See, ___ e.g., Parker v. Nashus, 76 F.3d 9, 12 (1st Cir. 1996). ____ ______ ______ 11 El/Cap's basic contention is that it should not be made to pay for lost pipeline; it does not claim that the jury's award is otherwise unreasonable. That is, El/Cap does not argue that the damage award is excessive in the sense of not being based on the jury's findings of liability; rather, El/Cap challenges those findings of liability. Indeed, the jury award of $221,300 is not unreasonable, assuming the jury found the defendants liable for all of the damages claimed. Trial testimony, considered in the light most favorable to the verdict, indicated that the LITTLE GEORGE and its cargo, which sank, were worth $102,333, Tr. at 283; that the damage suffered by the AMBER II totalled $68,300, Tr. at 281; and that the value of the lost pipeline was $76,427, Tr. at 284. Thus, in light of direct replacement or repair cost estimates put forward by C&G's expert at trial, the jury damages award is far from unreasonable.  -17- the claim of error had been properly preserved, we would review the district court's refusal to use the verdict form offered by El/Cap, and any challenge to the wording of the special verdict form used under Rule 49(a), for abuse of discretion. See, e.g., ___ ____ Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, __________________________ _____________________ 190 (4th Cir. 1994) (collecting cases).  However, our review in this case is further restricted to "plain error" review because El/Cap did not object to the special verdict form after the instructions had been given and before the jury retired. See Fed. R. Civ. P. 51; Clausen v. SEA- ___ _______ ____ 3, Inc., 21 F.3d 1181, 1195-96 (1st Cir. 1994). Although El/Cap _______ proposed an alternative verdict form, it was required to renew any objections after the jury instructions, and did not do so despite being explicitly reminded by the court of the need to preserve its objections for appeal. We therefore limit our review to plain error. We discern no error, let alone plain error, in the trial court's rejection of El/Cap's verdict form in favor of its own. The trial court has broad discretion in crafting, and in deciding to use, special verdict forms. See Smith v. Lightning ___ _____ _________ Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988). The verdict _________________ form used by the court, attached as an appendix, required, in plain and unmistakable terms, the jury to make a finding of negligence and legal causation with regard to each of the defendants, to determine the extent of recoverable damages, to assess comparative negligence, and to apportion fault. Construed -18- against the background of the jury instructions, which properly set out the duty of reasonable care and maritime skill required in the towing context, see Tr. at 587-95, and which instructed ___ the jury to make determinations of liability by a preponderance of evidence as "to each particular claim" made by C&G, see Tr. at ___ 597-98, this verdict form fully and fairly put the issues of negligence raised in the case before the jury. See, e.g., Putnam ___ ____ ______ Resources v. Pateman, 958 F.2d 448, 455 (1st Cir. 1992) ("[I]t is _________ _______ well established that verdicts must be construed in light of the totality of the surrounding circumstances, including the court's instructions."). On plain error review, our task ends with our finding that the wording of the verdict form did not hinder or prevent the jury from making any of the relevant findings as to damages that they had been properly instructed by the district court to make.12 Hence, there is no threat of a "clear miscarriage of justice" or of an error affecting the "fairness, integrity or public reputation of judicial proceedings." PHAV, ____ 915 F.2d at 769 (quoting Smith v. Massachusetts Inst. of Tech., _____ _____________________________ 877 F.2d 1106, 1109 (1st Cir. 1989)). CONCLUSION CONCLUSION  ____________________ 12 The significant difference between El/Cap's proposed form and the form used by the court is that El/Cap's form required that the jury write down a separate finding of damages for each item of C&G property at issue. The district court's decision not to list each of the C&G properties separately in the damage- assessment portion of the verdict form simply does not, as El/Cap argues, prevent the jury from assessing the negligence of the parties as to each damaged item. -19- For the reasons put forward in this opinion, we find no error in any of the trial court's actions challenged on this appeal, and therefore affirm the judgment entered by the district affirm ______ court pursuant to the jury verdict. -20- Appendix Appendix The verdict form used below read as follows:: 1. Was Defendant El Cap Towing Company, Inc. negligent and was such negligence a legal cause of damages sustained by the Plaintiff, C&G Excavating, Inc.? YES ____ NO ____  (Answer Question No. 2) (Answer Question No. 2) 2. Was Defendant Henry Marine Company, Inc. negligent and was such negligence a legal cause of damages sustained by the Plaintiff, C&G Excavating, Inc.? YES ___ NO___ (If the answer to either Question (If the answer to either Question No. 1 or No. 2 is "Yes," answer No. 1 or No. 2 is "Yes," answer question No. 3; otherwise, answer question No. 3; otherwise, answer no further questions.) no further questions.) 3. What is the total amount of damages sustained by the Plaintiff, C&G Excavating, Inc., as a result of the combined negligence of Defendants Henry Marine Company, Inc. and El Cap Towing Company, Inc.? _______________________________ $_________ (Write out in words) (Figures) (Write out in words) (Figures) (Answer Question No. 4) (Answer Question No. 4) 4. Was the Plaintiff, C&G Excavating, Inc., at fault and was such fault a legal cause of Plaintiff's damages? YES ____ NO ____ (If you have answered Question No. (If you have answered Question No. 4 "NO," answer Question No. 6; if 4 "NO," answer Question No. 6; if applicable; If you have answered applicable; If you have answered "YES," answer Question No. 5.) "YES," answer Question No. 5.) 5. To what amount should the damages to be recovered by Plaintiff, C&G Excavating, Inc., from the Defendants be reduced, having due regard for the nature and extent of Plaintiff's fault legally causing those damages? _____________________________ $_________ (Write out in Words)  (Write out in Words)  (Figures) (Figures) -21- (If you have answered both Question No. 1 (If you have answered both Question No. 1 and No. 2 'YES," answer Question No. 6; and No. 2 'YES," answer Question No. 6; otherwise, answer no further questions). otherwise, answer no further questions). 6. Apportionment of Fault: What portion of Apportionment of Fault the total fault of all the parties legally causing or substantially contributing to causing the damages you have found to be sustained by the plaintiff, C&G Excavating, Inc., do you attribute (by percentage) to each of the defendants, El Cap Towing Company, Inc. and Henry Marine Company, Inc.? (a) El Cap Towing Company, Inc. __________% (b) Henry Marine Company, Inc. __________% -22-