# United States Court of Appeals
## For the First Circuit

No. 16-2470

SAWYER BROTHERS, INC.; RYAN SAWYER; and ROSS SAWYER,

Plaintiffs, Appellees,

v.

ISLAND TRANSPORTER, LLC; and M/V ISLAND TRANSPORTER
(O.N. 1087160),

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Barron, Selya, and Lipez,
Circuit Judges.

Terence G. Kenneally, with whom Clinton & Muzyka P.C. was on brief, for appellants.
Twain Braden, with whom Leonard W. Langer and Thompson Bowie & Hatch LLC were on brief, for appellees.

April 3, 2018

**LIPEZ**, **Circuit Judge**.    Sawyer Brothers, Inc. hired Island Transporter, LLC to ferry three construction vehicles and their drivers from Rockland, Maine to North Haven, Maine. The M/V ISLAND TRANSPORTER encountered rough seas while traversing Penobscot Bay, and two of the vehicles tipped over onto the vessel's port bulwark. Sawyer Brothers, Inc., and its owners Ryan and Ross Sawyer (collectively, "Sawyer Brothers"), subsequently filed this maritime action, claiming that the ship captain was negligent and seeking damages for property loss and emotional distress.

Following a bench trial, the district court found in favor of Sawyer Brothers and awarded $257,154.03 in damages, including $100,000 for the Sawyers' emotional distress. On appeal, Island Transporter, LLC and M/V ISLAND TRANSPORTER (collectively, "Island Transporter") challenge both the district court's negligence finding and its damages award.

With the exception of one minor damages issue, we agree with the district court's well-reasoned decision, including its determination on an issue of first impression in our circuit -- that a plaintiff within the zone of danger can recover for negligent infliction of emotional distress in maritime cases. We therefore affirm its judgment in substantial part, vacating only one element of the damages award.

**I.**

In December 2014, Sawyer Brothers was hired to construct a foundation in North Haven, an island in Penobscot Bay.[1]  It engaged Island Transporter to ferry a cement truck, a Mack truck, and a pickup truck, along with the Sawyers themselves and the cement truck's driver, from Rockland Harbor to North Haven Harbor. The M/V ISLAND TRANSPORTER began its run to North Haven on the morning of December 11, 2014, with Richard Morse as its captain and James McIntyre as its mate.

The National Oceanic and Atmospheric Administration ("NOAA") provides mariners with weather information by making periodic forecasts and publishing data from weather buoys.  For forecasting purposes, NOAA divides the ocean into forecast areas, two of which are relevant to this case.  The route taken by the M/V ISLAND TRANSPORTER that morning fell within the southern portion of the Penobscot Bay area.  The Coastal Waters area from Stonington to Port Clyde ("Coastal Waters") borders the Penobscot Bay area to the south.

At the time the vessel departed -- approximately 8:30 a.m. -- the most recent forecast from NOAA predicted southerly

---

[1] We summarize the background facts of this case only to the extent necessary to contextualize our analysis.  For a more detailed recitation, see Sawyer Brothers, Inc. v. M/V Island Transporter, No. 15-cv-00338-NT, 2016 WL 6537575 (D. Me. Nov. 3, 2016).

winds of 10-20 knots with waves of 2-4 feet for the Penobscot Bay area.  For the Coastal Waters area, NOAA predicted significantly higher waves of 8-11 feet, with wind gusts up to 30 knots.  These predicted wave heights represent the average of the highest one third of all waves -- a measurement known as "significant wave height."  Thus, when a forecast predicts waves of 2-4 feet, it is reasonable to expect some waves to be higher than 4 feet.

NOAA also publishes data from weather buoys maintained by the North Eastern Regional Association of Coastal Ocean Observing Systems.  One such buoy, known as the F01 buoy, is proximate to the route taken by the M/V ISLAND TRANSPORTER.  Data from the buoy is published hourly online and on the radio.  At 7:30 a.m. on December 11, 2014, the buoy recorded a significant wave height of 6.3 feet, with 10.7 seconds between waves, and wind speeds of 18.7 knots.  At 8:30 a.m., the significant wave height was 6.7 feet, with 5.3 seconds between waves.  By 9:30 a.m., the significant wave height had increased to 7.1 feet, with 5.3 seconds between waves.

Captain Morse relied on the forecast for the Penobscot Bay area the morning of December 11, but disregarded the Coastal Waters forecast because his route did not cross into that area. It was part of Captain Morse's normal routine to check the F01 buoy's data, though he has no specific recollection of checking the buoy's data on that particular morning.  In any event, Captain

Morse determined that the forecast allowed for safe passage to North Haven, and he arrived at Rockland Harbor to load the vehicles and passengers.

Once aboard, Ryan Sawyer sat in Sawyer Brothers' 1987 Mack truck, which was situated at the vessel's bow, with the truck's cabin facing forward. The truck was mounted with a 1992 Copma knuckleboom crane, capable of extending 68 feet and lifting 2,400 pounds. Ross Sawyer sat in Sawyer Brothers' pick-up truck, which was located in the middle of the vessel, facing the stern. Dana Martin, who is not a party to this suit, sat in his loaded cement truck, which was situated at the vessel's stern, with the truck's cabin facing forward toward the bow. Mate McIntyre placed chocks at all three vehicles' wheels to help stabilize them for the trip. He did not take the additional precaution of chaining the vehicles to the "D rings" located on the vessel's deck.

Conditions were mild as the vessel left the dock. Once the ship cleared the protected waters of Rockland Harbor and entered the stretch of open water between the mainland and North Haven, calm seas gave way to a far more tumultuous environment. Video captured on Ryan Sawyer's cellphone shows the vessel's bow dipping up and down, as sizeable waves crash aboard, peppering the Mack truck's windshield with sheets of ocean water. As Ryan Sawyer continued to film, a sequence of waves hit the starboard side of the ship and caused the truck to tip toward the vessel's port side

- 5 -

until the vehicle struck the port bulwark. The truck rested diagonally against the bulwark, with the driver-side door angled downward and the passenger-side door angled upward. Ryan Sawyer feared that he would be trapped in the truck's cabin as it went overboard, or as the ship capsized. After a minute or two, he was able to escape the cabin by standing on the side of the driver's seat, pushing open the passenger-side door, lifting himself out of the cabin, and jumping down to the deck.

At the other end of the vessel, Dana Martin was sitting inside the cement truck as it also tipped over, striking the port-side bulwark, and resting against it diagonally.[2] Martin honked the truck's horn to alert everyone to the situation, and then managed to exit the truck's cabin through its driver-side door. Ross Sawyer watched the scene unfold and feared that the cement truck and the Mack truck would tip overboard with Martin and his brother trapped inside. He also feared that the ship would capsize, and he would drown.

Although the weight of the vehicles against the port-side bulwark caused the M/V ISLAND TRANSPORTER to develop a significant list of 37 degrees, Captain Morse navigated the ferry to North Haven harbor without further incident. The Sawyers

---

[2] This case does not involve damages for the cement truck. Though the record does not disclose whether the cement truck was owned by Dana Martin or his employer, neither is a party in the case.

managed to walk away physically uninjured, but their Mack truck sustained enough damage that their insurer would later deem it a total loss.

Sawyer Brothers filed suit against Island Transporter in August 2015, alleging negligence and seeking damages for its Mack truck, lost profits, damaged construction supplies, and emotional distress. Following a three-day bench trial, the district court found that Captain Morse was negligent in failing to lash down the Mack truck and the cement truck. It awarded Sawyer Brothers $126,859.03 for replacing the Mack truck, $5,025 for damaged plywood panels that the Mack truck was carrying, $25,270 for lost profits, and $100,000 for emotional distress. Island Transporter now appeals the district court's finding of negligence and each damages award.

**II.**

**A. Standard of Review**

Island Transporter challenges the subsidiary factual findings upon which the district court based its negligence determination. Where a district court conducts a bench trial and serves as the factfinder, we review its factual findings for clear error. See N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 67 (1st Cir. 2009); Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 181 (1st Cir. 1997). Accordingly, we will set aside a trial court's factual findings only if "after careful

evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong." N. Ins. Co. of N.Y., 579 F.3d at 67 (quoting Jackson v. United States, 156 F.3d 230, 232-33 (1st Cir. 1998)).

Island Transporter's challenge to the district court's damages award rests on both factual and legal grounds. We review the district court's factual determinations in fixing damages for clear error. See La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc., 124 F.3d 10, 21 (1st Cir. 1997); Reilly v. United States, 863 F.2d 149, 166 (1st Cir. 1988). We review its legal conclusions de novo. See Lawton v. Nyman, 327 F.3d 30, 42 (1st Cir. 2003) ("The district court's method of calculating damages in this case is essentially a conclusion of law, to which we give full review.").

**B. Negligence**

While the familiar elements of negligence -- duty, breach, causation, and damages -- apply in maritime cases, we look to "the principles of maritime negligence" to provide substance to each element. La Esperanza de P.R., Inc., 124 F.3d at 17; see also Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000) (reciting the elements of negligence in a maritime case). Thus, under maritime negligence law, "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Kermarec v. Compagnie

- 8 -

Generale Transatlantique, 358 U.S. 625, 630 (1959). A private carrier, such as Island Transporter, also assumes a duty "to exercise due care in the protection of the goods committed to [its] care." Commercial Molasses Corp. v. N.Y. Tank Barge Corp., 314 U.S. 104, 110 (1941). "Under this standard, the degree of care required must be in proportion to the apparent risk." Muratore v. M/S Scotia Prince, 845 F.2d 347, 353 (1st Cir. 1988). A captain breaches his duty of reasonable care "if he 'makes a decision which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at the time and under the circumstances.'" DiMillo v. Sheepscot Pilots, Inc., 870 F.2d 746, 748 (1st Cir. 1989) (alteration omitted) (quoting The Lizzie D. Shaw, 47 F.2d 820, 822 (3d Cir. 1931)). We have long recognized that, for a captain, the duty of reasonable care clearly includes a "duty to monitor and take into account weather conditions." Id.

The district court found that Captain Morse breached his duty of care by failing to utilize the M/V ISLAND TRANSPORTER'S D-rings to lash down the construction vehicles. This negligence determination was based in part upon the district court's subsidiary finding that the weather conditions that caused the incident were foreseeable. More specifically, the court determined that the weather information available to Captain Morse would have apprised him of a likelihood of rough seas. The

- 9 -

district court also found that the incident was not caused by two unforeseeable rogue waves.

Island Transporter challenges both of these subsidiary factual findings. It asserts that the weather information available to Captain Morse would not have apprised him of rough seas along his route, and maintains that the incident was caused by two unpredictable rogue waves. Under its view of the facts, Island Transporter argues that Captain Morse did not breach his duty of care because the incident was unforeseeable.

**1. Available Weather Information**

The district court determined that Captain Morse could have reasonably anticipated 5-7.5 foot seas on the voyage. It reached this conclusion by averaging the 2-4 foot seas forecasted for the Penobscot Bay area and the 8-11 foot seas forecasted for the Coastal Waters area. Island Transporter believes this calculation was clearly erroneous because the M/V ISLAND TRANSPORTER'S route remained entirely within the Penobscot Bay area. Thus, according to Island Transporter, only that area's forecast was relevant to Captain Morse. Given the much calmer 2-4 foot predicted seas, he could not have reasonably foreseen the conditions the M/V ISLAND TRANSPORTER would encounter.

Island Transporter's position overlooks an abundance of testimony suggesting that the Coastal Waters forecast was relevant to assessing the sea conditions along the vessel's route. Though

the route fell entirely within Penobscot Bay, it came close to the northern border of the Coastal Waters area. The wind on the morning of December 11 was blowing from a southerly direction; that is, from the open seas of the Coastal Waters area toward the Penobscot Bay area. Maine State Ferry Captain Almer Dinsmore testified that, given the direction of the wind and the route's proximity to the Coastal Waters area, the Coastal Waters forecast was highly relevant to assessing the predicted weather conditions along the route. He opined that it would have been unreasonable in those circumstances for a ship captain to rely solely on the Penobscot Bay forecast.

Other witnesses echoed this sentiment. Both Mate McIntyre and Maine State Ferry Service Port Captain Daniel McNichol represented that they rely on both areas' forecasts when they sail comparable routes. Island Transporter's own weather expert testified that it would be unreasonable to think there would be an abrupt transition -- from 2-4 foot seas in Penobscot Bay to 8-11 foot seas in the Coastal Waters area -- right at the boundary of the two zones.[3] Island Transporter's nautical expert similarly testified on cross examination that it would be a mistake to rely solely on the Penobscot Bay forecast. Even Captain Morse conceded

---

[3] Sawyer Brothers elicited this testimony after it called Island Transporter's weather expert, Ken McKinley, as a witness in its case-in-chief.

- 11 -

that it is generally prudent to rely on more than one piece of weather information in making navigational decisions, and that the Coastal Waters forecast is in some circumstances relevant to the Rockland-to-North Haven route.

Given this testimony, the district court's finding that the information available to Captain Morse would have apprised him of a likelihood of rough conditions did not rest on a clearly erroneous view of the facts. To the contrary, the record contains ample testimony to support the court's conclusion that the Coastal Waters area forecast was relevant to predicting the weather conditions along the M/V ISLAND TRANSPORTER'S route.

**2. The Rogue Wave Theory**

Island Transporter challenges the district court's finding that the incident was not caused by two "rogue waves." A rogue wave is classified as such if it is more than twice the significant wave height. Although the record does not reveal precisely how often rogue waves occur, expert testimony established that so-called "extreme waves" -- those reaching about double the significant wave height -- occur once every thousand waves. Rogue waves are not only larger, but also rarer than extreme waves.

The only evidence at trial supporting Island Transporter's rogue wave theory was Captain Morse's testimony. He testified that two rogue waves hit the vessel in quick succession,

causing the cement truck and the Mack truck to tip against the port bulwark.  According to Captain Morse, these waves were 12-15 feet high, and anomalous compared to the other waves the vessel had encountered.

The district court found Captain Morse's testimony to be not credible for a number of reasons.  It noted that Captain Morse was the only witness who testified to having seen the rogue waves. The court also stated that the Coast Guard incident report filed by Island Transporter identified the offending waves as being 10-12 feet, not 12-15 feet.  Such waves were foreseeable -- not rogue -- considering the predicted wave heights for the Penobscot Bay and Coastal Waters areas, as well as the F01 buoy data.  Perhaps most damaging to Captain Morse's testimony is the video recorded by Ryan Sawyer from the Mack truck's cabin.  The district court observed that the video depicted a series of similarly sized waves, not two anomalous swells.

We have repeatedly said that "in a bench trial, credibility calls are for the trier." Carr v. PMS Fishing Corp., 191 F.3d 1, 7 (1st Cir. 1999).  We see no basis here for deviating from that principle.  Indeed, the district court aptly supported its credibility assessment by finding that Ryan Sawyer's video, the weather data, the Coast Guard report, and the lack of corroborating testimony contradicted Captain Morse's position.

Our review of that evidence confirms that the court's decision to reject the rogue wave theory was not clearly erroneous.

**C. Damages for the Mack Truck**

The district court awarded Sawyer Brothers $126,859.03 for the loss of its Mack truck, after finding that the truck's fair market value could not be established, and using as the relevant measure of damages Sawyer Brothers' replacement cost. The court assessed that cost as $206,859.03. It then deducted $80,000 to account for Sawyer Brothers' insurance recovery, resulting in the $126,859.03 award.

Island Transporter challenges this award on three grounds. First, it assails the district court's finding that the truck's fair market value could not be reasonably established. Second, it argues that the court committed legal error by failing to deduct the Mack truck's salvage value from Sawyer Brothers' damages. Third, it challenges the court's decision to treat Sawyer Brothers as the real party in interest for its Mack truck, asserting instead that the company's insurer was the real party in interest.

**1. Fair Market Value vs. Replacement Cost**

The parties agree that the ordinary measure of damages under maritime law for property deemed a total loss is the property's fair market value, less its salvage value. See Dimillo, 870 F.2d at 752 ("[W]here a vessel is adjudged a complete loss,

the damages will be derived by calculating the vessel's value and deducting therefrom the salvage proceeds, if any there be."); Texas Co. v. R. O'Brien & Co., 242 F.2d 526, 527 (1st Cir. 1957) (stating that "the normal measure of damages is the vessel's fair market value").[4]  Courts determine fair market value based on the price paid for comparable property on the open market.  See Standard Oil Co. of N.J. v. S. Pac. Co., 268 U.S. 146, 155 (1925); Moench v. Marquette Transp. Co. Gulf-Inland, 838 F.3d 586, 592 (5th Cir. 2016).  If fair market value cannot be determined, courts may resort to alternative measures of damages.  See, e.g., Standard Oil, 268 U.S. at 155 ("Where there is no market value, . . . other evidence is resorted to."); Moench, 838 F.3d at 592.[5]

Island Transporter argues that the evidence at trial allowed the district court to establish the Mack truck's fair market value, making the court's decision to resort to replacement

_____

[4] In addressing the damages analysis for the Mack truck, both the parties and the district court relied primarily on case law dealing with damaged vessels.  See, e.g., Standard Oil Co. of N.J. v. S. Pac. Co., 268 U.S. 146 (1925); Dimillo, 870 F.2d at 746; Greer v. United States, 505 F.2d 90 (5th Cir. 1974).  Although the Mack truck is not a vessel, the rule for measuring damages to cargo is materially similar to the rule for measuring damages to vessels. See Columbia Brick Works, Inc. v. Royal Ins. Co. of Am., 768 F.2d 1066, 1068-69 (9th Cir. 1985) (explaining that the proper measure of damages for cargo is based on market value, but that courts may use other indicators of value when market price proves inaccurate).

[5] See also Ill. Cent. R.R. v. Crail, 281 U.S. 57, 64-65 (1930) ("The test of market value is at best but a convenient means of getting at the loss suffered.  It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable.").

cost erroneous. Specifically, Island Transporter contends that the court should have relied on its valuation expert's estimate of the truck's fair market value, or on Ryan Sawyer's lay testimony regarding fair market value.

Island Transporter's expert assessed the Mack truck's fair market value at $38,000. He reached this figure by employing a peculiar methodology. Sawyer Brothers had filed an insurance claim following the incident, and its insurer took possession of the Mack truck as part of the claim's settlement. A third party then listed the truck for sale for $39,500. The valuation expert used this listing as the benchmark to estimate the Mack truck's fair market value. However, the expert testified that when he made this estimate, he did not realize that the Mack truck had been listed for sale in its damaged condition.

The district court rejected the expert's valuation, finding that his methodology was "seriously discredit[ing]." We agree. The expert erroneously assessed the value of the undamaged Mack truck based on its listing price in its damaged condition. Given his flawed methodology, the district court was not obligated to rely on the expert's conclusion in awarding damages for the Mack truck.

Ryan Sawyer also offered an opinion as to the Mack truck's value. Disputing the valuation expert's $38,000 estimate, Ryan opined that the truck was worth $80,000 to $90,000. He then

testified at length about his attempts to find a replacement truck, explaining that -- to suit Sawyer Brothers' needs -- the company required a truck with a minimum 68-foot crane, a flatbed to hold equipment, four outriggers, and certain other features. The truck would also have to be capable of passing Department of Transportation and Occupational Safety and Health Administration safety inspections. Despite reviewing truck listings for months, Ryan stated that he could not find a replacement that met these specifications. Eventually, he located a 2006 Sterling crane truck in Wisconsin. Sawyer Brothers purchased and then modified the truck to suit its needs, at a total cost of $206,859.03, according to the district court. Ryan testified that this was the least expensive truck he could locate.

In finding that the Mack truck's fair market value could not be reasonably established, the district court did not mention Ryan Sawyer's testimony that the truck was worth $80,000 to $90,000. This omission does not undermine the court's finding. As an initial matter, the phrase "fair market value" is a term of art under maritime law. It refers to a specific measure of valuation, based on the price of "contemporaneous sales of like property . . . bought and sold in the market." Standard Oil, 268 U.S. at 155. Ryan, a lay witness, was not provided with this definition when he testified, and offered no indication that the basis for his valuation was sales of "like property." Id. Indeed,

when asked by Sawyer Brothers' attorney to provide a basis for his estimate, Ryan appeared not to understand the line of questioning.

Apparently realizing that Ryan would not be able to articulate a basis for his valuation, Sawyer Brothers' attorney began asking him about the unique features of the Mack truck, and his prolonged search for replacing it. As noted above, Ryan responded to this line of questioning by explaining that he was unable to find any comparable trucks on the market after months of searching. In other words, Ryan testified, at considerable length, that the market lacked any sales of "like property" that could be used to establish the Mack truck's fair market value. Id. This fact is precisely what justified the district court's decision to resort to an alternative measure of damages. The balance of Ryan's testimony thus undermined his lay assessment of the truck's fair market value and supported the court's finding that the fair market value could not be established. For these reasons, the district court was not obligated to rely on his estimate of the truck's value.[6]

**2. The Salvage Value Deduction**

As noted, the district court determined that Sawyer Brothers' replacement cost was $206,859.03. It then reduced that

_____

[6] Island Transporter does not challenge the district court's choice of replacement cost as the alternative measure of damages, so we do not reach that issue.

amount by $80,000 to account for the company's insurance recovery, and awarded Sawyer Brothers $126,859.03 for the Mack truck. Island Transporter argues that the district court should have also reduced the award by the Mack truck's salvage value, which it asserts was $39,500. See Dimillo, 870 F.2d at 752. We do not agree.

A careful review of the record shows that Sawyer Brothers forfeited the Mack truck's salvage value to its insurer following the incident. Ryan Sawyer testified that Sawyer Brothers filed a claim with its insurance company, and the insurer deemed the Mack truck a total loss. Sawyer Brothers then settled its insurance claim for $80,000, and -- importantly -- the insurer took possession of the damaged Mack truck as a condition of the payment. The salvage value thus became the insurer's property, and the district court correctly abstained from further reducing the damages award.

### 3. Real Party in Interest

Pursuant to Federal Rule of Civil Procedure 17(a), all civil actions must be "prosecuted in the name of the real party in interest." When an insurer has paid the entire loss suffered by its insured, the insurer becomes the real party in interest. See United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 380–81 (1949); State Farm Mut. Liab. Ins. Co. v. United States, 172 F.2d 737, 739 (1st Cir. 1949). However, when an insurer pays only part of the loss suffered by its insured, the insured remains a real

party in interest together with the insurer.  See Aetna Cas. & Sur. Co., 338 U.S. at 381; State Farm Mut. Liab. Ins. Co., 172 F.2d at 739.

Island Transporter argues that Sawyer Brothers is not a real party in interest because Sawyer Brothers' insurer paid its entire loss.  However, the district court properly found that Sawyer Brothers' loss exceeded its gross insurance recovery by $126,859.03.  Sawyer Brothers was thus a real party in interest because its insurer paid only part of its loss.

**D. Damaged Panels**

The district court awarded Sawyer Brothers $5,025 for plywood panels that it found were damaged in the incident.  The only evidence offered by Sawyer Brothers pertaining to the damaged plywood panels was the testimony of Ryan Sawyer.  He testified that the Mack truck was carrying 63 eight-foot plywood panels, which cost an average of $120.50 each.[7]  Ryan estimated that approximately 80% of the panels were damaged on the voyage, but declared that Sawyer Brothers continued to use the panels in their damaged condition.  This was so, he explained, even though the use of damaged panels generally results in a reduced quality of work.

---

[7] More precisely, Ryan testified that the truck was carrying 126 four-foot panels, and that the four-foot panels were made by cutting eight-foot panels in half.  He estimated that the eight-foot panels cost between $118 and $123 each.

Based on this testimony, the district court found that the incident caused damage to approximately 50 eight-foot panels. It multiplied this quantity by a $120.50 per-panel cost to reach a total of $6,025. The court then reduced this amount by $1,000 to account for its finding that Sawyer Brothers continued to use "some" of the damaged panels. That is to say, the district court did not award damages for panels that it found Sawyer Brothers continued to use on construction projects.

The district court's findings regarding the cost of the panels and the number of panels damaged are consistent with Ryan Sawyer's testimony, but its finding regarding Sawyer Brothers' continued use of the panels is not. It mistakenly concluded that Sawyer Brothers only continued to use some of the damaged panels, when Ryan testified that the company continued to use all of the damaged panels. Moreover, Ryan Sawyer did not indicate that the diminished quality of work caused by using damaged panels resulted in any injury to Sawyer Brothers -- for example, in the form of increased labor costs or decreased revenue. For these reasons, the district court's $5,025 award for damaged panels rests on a clearly erroneous view of the facts.

**E. Lost Profits**

The district court awarded Sawyer Brothers $25,270 in damages for the cost of additional labor, and for certain jobs it declined, because it could not use its Mack truck. In challenging

- 21 -

this award, Island Transporter alludes to the maritime-law maxim that when a vessel is a total loss, the owner cannot recover lost-profit damages.  See The Umbria, 166 U.S. 404, 421-22 (1897).  It argues that the rule applies to the lost profits caused by the damage to Sawyer Brothers' Mack truck.  We disagree.

In The Umbria, the Supreme Court declined to award damages for the "probable profits" of a charter agreement entered into shortly before a collision rendered the Iberia vessel a total loss.  Id. at 421.  Lost profits, the Court explained, "may be considered in cases of delay occasioned by a partial loss, where the question is as to the value of the use of the vessel pending her repairs."  Id.  But, where a vessel is a total loss,

> the recovery of such profits is limited to the voyage which the vessel is then performing; since, if the owner were entitled to recover the profits of a future voyage or charter, there would seem to be no limit to such right so far as respects the time of its continuance; and, if the vessel were under a charter which had months or years to run, the allowance of the probable profits of such charter might work a great practical injustice to the owner of the vessel causing the injury.

Id. at 422.

This old rule of maritime law survives to the present day.  See, e.g., A & S Transp. Co. v. Tug Fajardo, 688 F.2d 1, 2 (1st Cir. 1982); Matter of P & E Boat Rentals, Inc., 872 F.2d 642, 648 (5th Cir. 1989).  Its purpose, as stated in The Umbria, is to protect tortfeasors from incurring overly speculative or excessive

- 22 -

liability, particularly when they damage vessels that have months, or years, of work under agreement. 166 U.S. at 422. The owner of such a vessel is instead expected to promptly acquire a replacement to fulfill its chartered obligations. See Barger v. Hanson, 426 F.2d 640, 642 (9th Cir. 1970) ("[The law] considers that ships are commodities bought and sold in the market, and that one may be purchased to take the place of one lost . . . ." (quoting The Hamilton, 95 F. 844, 845 (E.D.N.Y. 1899))).

The rule of The Umbria does not apply in this case for an obvious reason. Sawyer Brothers' Mack truck was not a vessel. It was cargo aboard a vessel.[8] Island Transporter cites no case that applies The Umbria's rule to cargo, and we see no basis for extending the rule to such cases.

Moreover, even in the context of vessels, we have recognized that "arguments may be made, pro and con, for [the rule's] soundness as an original proposition." A & S Transp. Co., 688 F.2d at 3. For example, ordinary principles of mitigation would seem to resolve the problems involving excessive or speculative damages identified by the Court. Indeed, in Barger,

---

[8] As we observed, supra note 4, this distinction was not significant in valuing the Mack truck because the well-established rules for valuing cargo and vessels are materially similar. In contrast, Island Transporter now seeks to extend to cargo cases a principle of damages that has traditionally applied only to vessels. Its position thus places the distinction between vessels and cargo at the forefront.

the Ninth Circuit declined to apply the rule of The Umbria in a vessel case in part because the plaintiff had mitigated his damages "as quickly as possible." 426 F.2d at 642. Though we have since declined to follow Barger's decision to depart from the "well-established" rule in vessel cases, the Ninth Circuit's reasoning and our prior reference to the rule's questionable soundness counsel against extending it to new ground. A & S Transp. Co., 688 F.2d at 3 (noting that the rule is "too well-established to be altered now, at least at our level").

We thus uphold the district court's award of lost profit damages.[9]

### F. Emotional Distress

The district court awarded the Sawyers each $50,000 in damages for their emotional distress. Island Transporter challenges this award, raising several issues related to the standard of liability for negligent infliction of emotional distress ("NIED") claims under the general maritime law in the

---

[9] We also reject Island Transporter's contention that Sawyer Brothers failed to mitigate its damages. The district court rebuffed this argument after finding that Sawyer Brothers' cost to rent a suitable replacement truck would have been $3,800 per month, plus a $10,000 delivery fee. The court concluded that these costs made renting a replacement truck to perform Sawyer Brothers' lost work unreasonable. We find no error in this conclusion. In addition, we note that the district court carefully circumscribed Sawyer Brothers' damages award to the approximately six-week period following the incident, declining to include lost profits that it considered speculative or too attenuated.

First Circuit.  We uphold the award.  In doing so, we conclude that maritime plaintiffs within the "zone of danger" can recover for NIED in the First Circuit.

### 1. The NIED Cause of Action

As a threshold matter, the district court assumed that a claim for NIED is cognizable under the general maritime law in the First Circuit.  It was correct to do so.  We recognized a plaintiff's right to recover for NIED under the general maritime law in Petition of the U.S. (Petition), 418 F.2d 264, 269 (1st Cir. 1969).  The plaintiff in Petition was a crewman who nearly died in the cold seas after his vessel capsized.  Id. at 267.  Following the incident, the plaintiff became "very depressed and emotionally upset," and was diagnosed with "severe neurosis of an anxiety reaction type with depressive features."  Id.  The district court awarded the plaintiff damages due to his emotional distress and accompanying physical symptoms, and the defendant appealed.  Id. at 267-68.

Surveying the common-law treatment of NIED claims, we observed that it was "almost uniformly recognized that recovery may be had for the physical consequences of mental disturbance, at least where there is some contemporaneous physical impact also resulting from [a] defendant's negligence."  Id. at 268.  In other words, we described the general state of the law as imposing two limitations on a plaintiff's ability to recover for NIED.  First,

the plaintiff had to experience a physical impact from the defendant's negligence during the incident in question. Second, the plaintiff's emotional distress had to have a "physical consequence" that is "susceptible of objective determination." Id. at 269.

We determined that the Petition plaintiff's "substantial jolt," and the impact from being "thrown into the water as the boat capsized," were both "sufficient to satisfy the test applied by jurisdictions following the impact rule." Id. at 268. Since the plaintiff satisfied the physical impact test, we found it "unnecessary to decide whether a contemporaneous physical impact" was "required as a prerequisite to recovery" for NIED in the First Circuit. Id. at 269. We then proceeded to the physical consequence issue and concluded that the plaintiff's "definite nervous disorder" was a sufficiently "physical" injury to permit recovery. Id.

By affirming the district court's damages award, our decision in Petition recognized a cause of action for NIED under the general maritime law. However, Petition left the contours of the cause of action unresolved. It expressly declined to decide whether a contemporaneous physical impact was a prerequisite to recovery. And, because the Petition plaintiff suffered physical consequences from his emotional distress, we had no occasion to determine whether a plaintiff can recover for NIED without showing

physical consequences within the meaning of Petition. This was the state of our maritime NIED jurisprudence at the time this case was tried. We recognized the cause of action, but had yet to define its boundaries.[10]

**2. The Zone of Danger Test**

This case compels us to confront the first issue left open by Petition: whether a plaintiff can recover for NIED under the general maritime law without sustaining a contemporaneous physical impact. The district court awarded the Sawyers emotional distress damages based on their presence within the "zone of danger," not based upon any physical impact. Island Transporter asks us to adopt the physical impact test, and to accordingly vacate the district court's damages award.

The "zone of danger" test applied by the district court limits recovery for emotional injury to those "who are placed in immediate risk of physical harm by that conduct." Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 548 (1994). In Gottshall, the Supreme Court held that the zone of danger test applies to NIED claims brought under the Federal Employers' Liability Act

---

[10] Our more recent pronouncements on the maritime NIED cause of action are consistent with Petition. See Ellenwood v. Exxon Shipping Co., 984 F.2d 1270, 1282 (1st Cir. 1993) (declining to decide whether "a seaman may recover emotional distress damages without showing a physical injury" (emphasis added)); Fairest-Knight v. Marine World Distribs., Inc., 652 F.3d 94, 102 n.7 (1st Cir. 2011) (refusing to decide whether plaintiffs had made out a cognizable cause of action for NIED).

("FELA"), 45 U.S.C. §§ 51-60. Id. at 554. Section 1 of the FELA provides railroad employees with a cause of action when they are injured or killed as a result of their employers' negligence. 45 U.S.C. § 51. The Jones Act provides a parallel cause of action for seamen, 46 U.S.C. § 30104, and incorporates by reference the standard of liability under the FELA. Id. ("Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."). Thus, we have declared that "[c]aselaw developed under both statutes guides subsequent interpretation of either of them." Ellenwood, 984 F.2d at 1281 n.15 (citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 547 (1960)); see also Butynski v. Springfield Terminal Ry. Co., 592 F.3d 272, 277 n.2 (1st Cir. 2010) ("[P]recedent under the Jones Act is deemed instructive in FELA cases, and vice versa.").

The zone of danger test, as articulated in Gottshall, therefore applies to seamen alleging NIED under the Jones Act. Given its application to seamen, we see no principled basis for imposing the more restrictive physical impact test upon passengers alleging NIED under the general maritime law. See Miles v. Apex Marine Corp., 498 U.S. 19, 24 (1990) ("[L]egislation has always served as an important source of . . . admiralty principles."); Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1407-08 (9th Cir. 1994) ("[W]e look to . . . maritime statutes for guidance in

determining what remedies should be available in an admiralty case . . . that falls outside the ambit of statutory maritime law.").

In so concluding, we join two circuits and a number of district courts in recognizing that, post-Gottshall, a plaintiff within the zone of danger may recover for NIED under the general maritime law.  See Chaparro v. Carnival Corp., 693 F.3d 1333, 1338 (11th Cir. 2012) (per curiam); Stacy v. Rederiet Otto Danielsen, A.S., 609 F.3d 1033, 1035 (9th Cir. 2010); Blair v. NCL (Bahamas) Ltd., 212 F. Supp. 3d 1264, 1271 (S.D. Fla. 2016); Nieto-Vincenty v. Valledor, 22 F. Supp. 3d 153, 160 (D.P.R. 2014); Smith v. Carnival Corp., 584 F. Supp. 2d 1343, 1355 (S.D. Fla. 2008); Douville v. Casco Bay Island Transit, 1998 A.M.C. 2775, 2781 (D.N.H. 1998); Williams v. Carnival Cruise Lines, Inc., 907 F. Supp. 403, 406 (S.D. Fla. 1995).[11]

---

[11] This case does not require us to determine whether Gottshall counsels against applying the more permissive "relative bystander" test to general maritime cases.  Gottshall, 512 U.S. at 548.  That test allows plaintiffs to recover "for emotional distress brought on by witnessing the injury or death of a third party (who typically must be a close relative of the bystander) that is caused by the defendant's negligence."  Id. at 549.  Gottshall rejected the relative bystander test in the context of the FELA, in large part because "it would be a rare occurrence for a [railroad] worker to witness during the course of his employment the injury or death of a close family member."  Id. at 556.  This reasoning does not necessarily translate to general maritime law, where "it is not at all 'unlikely' that a person involved in a maritime accident -- as opposed to a railroad worker covered by FELA -- would have occasion to witness the death or serious injury of a close family member."  Stacy, 609 F.3d at 1040 n.1 (Hall, J., dissenting).  For this reason, there may be a "principled basis" for not extending

### 3. The Scope of the Zone of Danger

Island Transporter next contends that the district court clearly erred[12] in finding that the Sawyers were within the zone of danger when the construction vehicles tipped and the M/V ISLAND TRANSPORTER took on a 37-degree list in tumultuous seas. A plaintiff is within the zone of danger if he sustains a physical impact, or is "placed in immediate risk of physical harm" by a defendant's negligent conduct. Gottshall, 512 U.S. at 548. Plaintiffs facing immediate physical peril or the reasonable apprehension thereof are within the zone of danger. See Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424, 430 (1997) (noting that the zone of danger cases cited by Gottshall all involved "a threatened physical contact that caused, or might have caused, immediate traumatic harm"); Gottshall, 512 U.S. at 555 ("The zone of danger test also is consistent with FELA's central focus on physical perils."). Indeed, it is oft repeated that "a near miss may be as frightening as a direct hit." Gottshall, 512 U.S. at 547 (quoting Richard N. Pearson, Liability to Bystanders for Negligently Inflicted Emotional Harm -- A Comment on the Nature of Arbitrary Rules, 34 U. Fla. L. Rev. 477, 488 (1982)).

---

Gottshall to general maritime relative bystander cases, though we do not decide that issue here.

[12] Whether a plaintiff was within the zone of danger presents a fact-dominated mixed question of law and fact, resulting in clear error review. See Sierra Fria Corp., 127 F.3d at 181 (explaining that fact-dominated mixed questions are reviewed for clear error).

Courts applying the test in maritime cases have consistently found that plaintiffs on board vessels that experience near misses are within the zone of danger. In Stacy, for example, the Ninth Circuit held that a fisherman sufficiently alleged he was in the zone of danger when a ship narrowly avoided hitting his fishing boat, only to collide with a nearby vessel. 609 F.3d at 1034-37. Similarly, the plaintiff in In re Clearsky Shipping Corp. was aboard a docked casino boat as a vessel collided with a nearby wharf. No. Civ. 96-4099, 2002 WL 31496659, *1 (E.D. La. Nov. 7, 2002). The plaintiff was "obviously in the 'zone of danger'" as she attempted to exit the casino boat and witnessed the other vessel coming directly toward her. Id. at *3.

In another near-miss case, a class of passengers sued a cruise line after they experienced a severe storm on their voyage. Williams, 907 F. Supp. at 404. The court found that the passengers "[met] the first part of the zone of danger test in that they were placed in immediate risk of physical impact by [the cruise line's] conduct." Id. at 407. Finally, the case of Hutton v. Norwegian Cruise Line Ltd. goes beyond a near miss and involves an actual collision. 144 F. Supp. 2d 1325 (S.D. Fla. 2001). There, a proposed class of passengers sued when their cruise ship collided with another vessel. Id. at 1326. The lead plaintiffs were sleeping in their cabin at the time of the collision, and then went to their muster (emergency) station, where they saw the other

vessel in flames.  Id.  The court found that when the ships collided the lead plaintiffs "were certainly within the zone of danger," as they "were frightened and were placed in immediate risk of physical harm by the Defendant's negligent conduct."  Id. at 1328.

It is fair to characterize the Sawyers' experience on board the M/V ISLAND TRANSPORTER as involving more immediate peril than any of the cases summarized above.  They were aboard a relatively small ferry as it attempted to traverse a sea roiled by large waves.  Ryan Sawyer was in the cabin of his Mack truck as its passenger-side wheels lifted off the ground, causing the vehicle to tip against the vessel's bulwark.  Ross Sawyer watched as the Mack truck and cement truck tipped with his brother and co-worker inside their respective cabins.  Both Sawyers reasonably feared that the vehicles would go overboard, or that the vessel -- listing significantly to its port -- would capsize.  Given this series of events, the district court did not clearly err by determining that the Sawyers were within the zone of danger.

### 4. The Physical Consequences Requirement

The second issue left open by Petition was whether a plaintiff can recover for NIED under the general maritime law without showing physical consequences of his emotional distress. The district court assumed that this requirement applied to the Sawyers' NIED claims, concluded that the brothers satisfied the requirement, and awarded each of them $50,000.  Island Transporter

contends that the district court clearly erred by finding that the Sawyers showed physical consequences of their emotional distress, and argues that the brothers cannot recover damages for NIED absent such a showing.

Whether the physical consequences requirement applies to NIED claims under the general maritime law is a matter of some disagreement among the federal courts. See, e.g., Tassinari v. Key W. Water Tours, L.C., 480 F. Supp. 2d 1318, 1321-22 (S.D. Fla. 2007) (collecting cases). As in Petition, this case does not require us to resolve that issue in the First Circuit. For reasons that we will explain, it was not clearly erroneous for the district court to conclude that the Sawyers satisfied the physical consequences requirement. Given that their NIED claims succeed regardless of whether the requirement applies, we, like the district court, assume, without deciding, that the requirement applies in this case.

The term "physical" in the physical consequences requirement "is not used in its ordinary sense." Id. at 269. Its meaning includes both consequences of emotional distress that are traditionally "physical" -- e.g., heart attacks or ulcers -- and other conditions that are "susceptible of objective determination." Id. For example, emotional distress may "physically" manifest as a psychological condition -- i.e., a nervous disorder or a stress disorder -- so long as the condition

- 33 -

is capable of objective determination.  See id. (categorizing psychoneurosis as a "physical" condition); Haught v. Maceluch, 681 F.2d 291, 299 n.9 (5th Cir. 1982) (noting that "physical injury" extends to nervous disorders, and deciding that "depression, nervousness, weight gain, and nightmares" were "sufficient to constitute physical injury" under Texas law).[13]  Whether a particular condition falls within the NIED definition of a "physical" consequence presents a fact-intensive question, requiring case-by-case assessment.  Cf. Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 570 (1987) (opining that "broad pronouncements" in the area of emotional distress claims "may have to bow to the precise application of developing legal principles to the particular facts at hand").

Here, we need not probe the physical consequences requirement's outer boundaries.  The district court found that the Sawyers experienced several symptoms properly classified as "physical."  It found that Ross Sawyer experienced ongoing gastrointestinal distress, pain in his limbs, and pain in his chest.  As to Ryan Sawyer, the district court concluded that he had a bout of stress-induced shingles accompanied by a high fever and pain that felt like a heart attack.  Several courts have found

---

[13] See also Sullivan v. Bos. Gas Co., 605 N.E.2d 805, 808-11 (Mass. 1993); Vance v. Vance, 408 A.2d 728, 733-34 (Md. 1979); Corso v. Merrill, 406 A.2d 300, 307 (N.H. 1979); Restatement (Second) of Torts § 436A cmt. c (1965).

that plaintiffs with comparable or lesser symptomology satisfied the physical consequences requirement.  See, e.g., Whalley v. Sakura, 804 F.2d 580, 587 (10th Cir. 1986) (finding requirement satisfied where plaintiff had loss of energy, fatigue, decreased mobility, sleep disturbance, and significant depression); Doe v. Trs. of the Univ. of Pa., 270 F. Supp. 3d 799, 828 (E.D. Pa. 2017) (allowing claim to survive dismissal where plaintiff's alleged physical consequences consisted of "depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night"); Terry v. Carnival Corp., 3 F. Supp. 3d 1363, 1370 (S.D. Fla. 2014) (allowing emotional distress claim to survive summary judgment where plaintiffs alleged physical consequences in the form of continuous sleep deprivation and nightmares); Sullivan, 605 N.E.2d at 806, 810 (Mass. 1993) (finding that symptoms such as sleeplessness, gastrointestinal distress, and nightmares allowed a plaintiff to survive summary judgment).  These cases are consistent with the Restatement (Second) of Torts' position that "long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character."  Restatement (Second) of Torts § 436A cmt. c (1965).

Furthermore, the district court noted that experts for both parties opined that Ross Sawyer could be diagnosed with Post-Traumatic Stress Disorder ("PTSD") as a result of the incident. One of the experts also testified that Ryan Sawyer could be diagnosed with PTSD. A PTSD diagnosis with accompanying symptoms has been found sufficient to satisfy the physical consequences requirement. See Walters v. Mintec/Int'l, 758 F.2d 73, 78 (3d Cir. 1985) (affirming emotional distress award in product liability case based on PTSD diagnosis, headaches, insomnia, and nightmares); Sullivan, 605 N.E.2d at 806-07, 810 (finding that plaintiff with PTSD and related symptoms could proceed to trial on NIED claim).

Given the substantial body of law approving of comparable symptomologies, it was not clearly erroneous for the district court to conclude that both brothers satisfied the physical consequences requirement.[14]

---

[14] In reaching this conclusion, we reject Island Transporter's contention that the district court clearly erred by determining that the Sawyers' symptoms were caused by the incident, rather than other work-related stresses, or their investment years earlier in a Ponzi scheme. We also reject Island Transporter's assertion that the district court errantly relied on Maine law. Although the court stated that Maine law does not impose the physical consequences requirement, it did not ultimately follow that precedent.

**5. Summary**

In sum, we hold that plaintiffs within the zone of danger may recover for NIED under the general maritime law. We also uphold the district court's findings that the Sawyers were within the zone of danger, and that they experienced physical consequences of emotional distress. Island Transporter does not challenge the amount of the district court's award. Accordingly, we affirm the district court's judgment awarding $50,000 to Ryan Sawyer and $50,000 to Ross Sawyer for their emotional distress.

## III. Conclusion

For the reasons discussed above, we affirm the district court's finding of negligence, and its award of damages for the Mack truck, lost profits, and emotional distress. We vacate the district court's damages award for the plywood panels, and remand with instructions to enter judgment consistent with this opinion. The parties shall bear their own costs on appeal.

So ordered.